

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 0256 | **DATE** | 2/18/2003 |
| **CASE TITLE** | Glenayre Electronics, Inc., vs. Philip Jackson | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Glenayre's Motion for Summary Judgment with respect to Claims 1, 3, 15, 59, 69 and 112 of the `900 patent is GRANTED. Glenayre's Motion for Summary Judgment with respect to Claims 5 and 79 of the `900 patent is DENIED. Jackson's Motion to Strike is GRANTED IN PART AND DENIED IN PART.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | FEB 19 2003 | | | 82 |
| ✓ | Docketing to mail notices. | | date docketed | | | |
| | Mail AO 450 form. | | | | | |
| | Copy to judge/magistrate judge. | | | | | |
| | | | U.S. DISTRICT COURT | date mailed notice | | |
| WAP | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

GLENAYRE ELECTRONICS, INC.,

        Plaintiff,

    v.

PHILIP JACKSON, an individual,

        Defendant.

PHILIP JACKSON,

      Counterclaim-Plaintiff,

    v.

GLENAYRE ELECTRONICS, INC.,
METROCALL, INC., ARCH WIRELESS,
INC., PRIMECO PERSONAL
COMMUNICATIONS, L.P., and JOHN
DOES (1-10),

      Counterclaim-Defendants.

FEB 1 8 2003

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

Case No. 02 CV 0256

Hon. Harry D. Leinenweber

DOCKETED
FEB 1 9 2003

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Glenayre Electronics, Inc. ("Glenayre") brings this action against defendant Philip Jackson ("Jackson") seeking "a declaratory judgment that none of its products infringe any claim of U.S. Patent No. 4,596,900" (the "'900 Patent") (Compl. ¶ 1) held by Jackson. Jackson, by way of an amended counterclaim filed October 16, 2002, alleges in turn that "Glenayre has infringed at least Claims 1, 3, 5, 15, 59, 69, 79 and 112 of the '900 patent through acts of direct infringement, contributory infringement and/or inducement in violation of 35 U.S.C. § 271." (Am. Countercl. ¶ 12.)



On September 27, 2002, the Court stayed Jackson's counterclaim, insofar as it is premised on theories of contributory infringement and inducement, pending resolution of the direct infringement allegations raised in this action. On November 21, 2002, the Court issued its Claims Construction Order (the "CC Order") construing the meaning and scope of disputed Claims 1, 3, 5, 15, 59, 69, 79 and 112 of the '900 patent. Presently before the Court is Glenayre's Motion for Summary Judgment. For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

The '900 patent "discloses and claims a set of electronic circuits for remotely controlling appliances or devices through the use of tones produced by touch-tones telephones." *Jackson v. Thomson Consumer Elecs., Inc.*, 139 F. Supp. 2d 1003, 1005 (S.D. Ind. 2001). As ably described by Judge Gettleman in *Jackson v. Casio Phonemate, Inc.*, 105 F. Supp. 2d 858 (N.D. Ill. 2000):

> [Jackson's] invention can be connected to, for example, a heating or air conditioning system or a lighting system, and enables a caller to remotely control the attached appliance. The caller can make the appliance perform a number of functions by using a predetermined sequence of tones, such as those tones generated by most telephones. The preferred embodiment of the apparatus covered by the '900 patent responds to one predetermined sequence of tones, known as the access code, and thereafter responds to other predetermined sequences of tones, known as "control codes" [occasionally referred to in this opinion as "control sequences"], which are used, for example, to turn the attached appliance on and off. [Jackson's] apparatus uses integrated circuit digital logic to perform its functions.

- 2 -

The '900 patent works in the following way: When sequences of two or more touch tones are entered into a telephone and received over a telephone line, the controller of the '900 patent responds by generating "control signals." The process begins when the owner of the appliance controlled by the '900 patent enters a specific "tone sequence," such as the sequence "*,1" or the sequence "# ,1." (The sequence "*,1" turns the controlled appliance on, while the sequence "# ,1" turns the controlled appliance off.) The tone sequences "*,1" and "# ,1" are two types of "control codes." The controller of the '900 patent includes a "detecting means" that detects the control code the owner has input. Once the control code is input and detected, the controller outputs a corresponding "sequence detection signal." The sequence detection signal is then fed to a bistable "control means" that always outputs either an "on" control signal or an "off" control signal to the controlled appliance. Consequently, if the owner enters the tone sequence "*,1," the ultimate result will be that the controlled appliance will turn on; conversely, if the owner enters the tone sequence, "# ,1," the ultimate result will be that the controlled appliance will turn off.

*Casio Phonemate, Inc*, 105 F. Supp. 2d at 861-62.

Glenayre manufactures and sells equipment to the telecommunications industry, providing carrier grade devices to network operators that, in turn, provide retail telephone services to the public. Jackson claims that certain of Glenayre's products, in particular certain voice messaging or "voice mail" hardware and software known as the MVP 2120 and MVP 4240 (together, the "MVP") (Am. Countercl. ¶ 13), infringe the '900 patent. The MVP is a complex, multiple-microprocessor computer server which is used in the central offices of telephone service providers (*i.e.,* phone companies) and interfaces with the telephone system at the trunk level. The MVP can be accessed remotely from a standard touch-tone telephone (in most cases after entry of an "access code" or password)

and allows a user to retrieve voice mail and to execute various other functions by using touch-tone commands.

## LEGAL STANDARDS

### Motion for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A fact is "material" if it could affect the outcome of the suit under the governing law; a dispute is "genuine" where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Supreme Court has emphasized "that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue [of material fact] for trial." *Id.* at 249. In performing this task, all factual disputes are resolved, and all reasonable inferences are drawn, in favor of the nonmoving party. *Jackson v. Illinois Medi-Car, Inc.,* 300 F.3d 760, 764 (7th Cir. 2002). However, "[s]elf-serving assertions without factual support in the record will not defeat a motion for summary judgment." *Jones v. Merchants Nat'l Bank & Trust Co.,* 42 F.3d 1054, 1058 (7th Cir. 1994).

The burden is initially upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories,

- 4 -

and admissions on file, together with the affidavits," if any, that the moving party believes demonstrate an absence of a genuine issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party may not rest upon the mere allegations contained in the nonmoving party's pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir. 1989). Accordingly, summary judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. As the Federal Circuit has noted in the context of patent cases, "the motion of an accused infringer for judgment on the ground of non-infringement of a patent may be granted where the patentee's proof is deficient in meeting an essential part of the legal standard for infringement." *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1577 (Fed. Cir. 1989). In such a situation, there can be "'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323.

### Infringement Criteria

Evaluating an infringement allegation requires comparing the construed claim to the accused device. The claims at issue in this

case are "means-plus-function" claims. They are therefore governed by 35 U.S.C. § 112, ¶ 6, which provides as follows:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.

"Literal infringement of a § 112, ¶ 6 limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification. Functional identity and either structural identity or equivalence are *both* necessary." *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999)(citations omitted; emphasis in original). As Judge Gettleman likewise framed the standard in *Casio Phonemate, Inc*: In order "'to meet a means-plus-function limitation, an accused device must (1) perform the identical function recited in the means limitation and (2) perform that function using the structure disclosed in the specification or an equivalent structure.'" *Casio Phonemate, Inc*, 105 F. Supp. 2d at 863-64 (quoting *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1578 (Fed. Cir. 1993)). Structural equivalence for purposes of Section 112, Paragraph 6 turns on "whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial." *Valmont*

*Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1043 (Fed. Cir. 1993).

Based on the literal infringement standard just articulated, it follows that if the accused device does not perform the *identical* function specified in the means limitation, then "section 112, paragraph 6 . . . is not involved," *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934 (Fed. Cir. 1987), and there can be no finding of literal infringement. However, the accused device might still be found to infringe under the doctrine of equivalents if it "performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same result as the claimed invention." *Id.* "[T]he doctrine of equivalents must be applied to individual elements of the claim, not the invention as a whole." *Warner-Jenkinson Co. v. Holton Davis Chem. Co.*, 520 U.S. 17, 29 (1997). "[I]n order for a court to find infringement [under the doctrine of equivalents], the [patent-holder] must show the presence of every element or its substantial equivalent in the accused device. To be a 'substantial equivalent,' the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed." *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1533 (Fed. Cir. 1987)(citation and internal quotation marks omitted). "In the doctrine of equivalents context, the following test is often used: if the 'function, way, or result' of the assertedly substitute

- 7 -

structure is substantially different from that described by the claim limitation, equivalence is not established." *Odetics, Inc.*, 185 F.3d at 1267.

As the Supreme Court has observed, the statutory infringement standard of 35 U.S.C. § 112, ¶ 6 is simply "an application of the doctrine of equivalents in a restrictive role." *Warner-Jenkinson Co.*, 520 U.S. at 28. Indeed, the only meaningful difference between the infringement analysis under 35 U.S.C. § 112, ¶ 6 and the doctrine of equivalents is that, under the statutory standard, "functional *identity* is required." *Odetics, Inc.*, 185 F.3d at 1267 (emphasis in original).

> The content of the test for insubstantial differences under § 112, ¶ 6 thus reduces to "way" and "result.". . . Structural equivalence under § 112, ¶ 6 is met only if the differences are insubstantial; that is, if the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification.

*Id.; Caterpillar Inc. v. Deere & Co.*, 224 F.3d 1374, 1379 (Fed. Cir. 2000)("A reduced version of the well-known tripartite test for the doctrine of equivalents has been applied in the § 112, ¶ 6 context to determine if the differences are insubstantial; an accused device is equivalent when it performs the identical function in substantially the same way to achieve substantially the same result.")

### Burden of Proof

"The determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact." *Madey v. Duke*

*Univ.*, 307 F.3d 1351, 1358 (Fed. Cir. 2002). As the patent owner, Jackson bears the burden of proving infringement. *Under Sea Indus., Inc. v. Dacor Corp.*, 833 F.2d 1551, 1557 (Fed. Cir. 1987) ("The burden always is on the patentee to show infringement.").

As noted at the outset of this opinion, the '900 patent describes a system made up of hard-wired, digital logic circuit elements. The MVP does not use hard-wired circuitry, instead implementing its voice messaging services through programmed microprocessors. It is therefore incontrovertible that the MVP does not contain structure(s) "*identical* . . . to the corresponding structure in the specification," *Odetics, Inc.*, 185 F.3d at 1267 (emphasis supplied), of the '900 patent. From the standpoint of structure, then, Jackson must resort to proof of structural *equivalency*, which, as previously discussed, will depend on whether any differences between the structure(s) of the MVP and the structure(s) disclosed in the specification of the '900 patent are "insubstantial." With respect to function, however, Jackson is free to pursue theories of identity and/or equivalency.

Thus, to prevail in this action for any given claim of the '900 patent, Jackson must prove that the MVP is programmed to perform the identical or equivalent functions recited in that claim. Further, Jackson must identify the particular components within the MVP (including any algorithm(s) used by its microprocessor(s)) that allegedly perform those functions, and he must show that those components are programmed to perform those functions in substantially

the same way as the corresponding individual digital logic circuit elements described in the '900 patent. *Cf. generally id.* at 1267-68.

## DISCUSSION

### Counterpart Claims

Before turning to the substance of the disputed claims in this case, the Court notes (as it did in its CC Order) that Claims 1, 3, 5 and 15 are, in relevant part, linguistically identical to their counterpart Claims 59, 69, 79 and 112. The only differences are that, in the latter group of claims, "tone signals" are specified as "DTMF tone signals" and each of the various means is specified as an "integrated circuit" means (*e.g.*, claim 1 describes a "control means," whereas claim 59 describes an "integrated circuit control means"). For purposes of the instant Motion for Summary Judgment, these slight syntactical asymmetries are immaterial. Accordingly, the Court will handle each claim and its counterpart under a single heading.

### Claims 1 and 59

Glenayre contends that the MVP does not perform the function of the "gating means." That is, couched in the more precise language of the summary judgment standard, Glenayre claims that Jackson has failed to adduce evidence from which a reasonable jury could conclude that the MVP performs either the identical, or an equivalent, function of the gating means. Glenayre is correct.

Independent claims 1 and 59 each call for a "gating means coupled in circuit for *disabling production* of said first and said

second detection signals respectively in response to said second
control signal and said first control signal, respectively, whereby
said apparatus cannot produce said first detection signal and said
second detection signal at the same time." '900 Patent Reexamination
Cert. B2, col. 2, ll. 25-33, col. 16, ll. 22-30 (emphasis supplied).
In its CC Order, the Court construed the function of the gating means
as follows:  "It is the function of the gating means to *prevent the
production* of a given sequence detection signal if the device is
already in the state associated with that signal and the same tone
sequence is entered a second time."  CC Order, Chart at 2 (internal
quotation marks omitted; emphasis supplied).  As described by Judge
Gettleman:

> The language of Claim 1 and the detailed description
> explain that entering a predetermined sequence of
> predetermined tone signals (such as the tones # and 1),
> produces a corresponding sequence detection signal, and a
> certain gate and flip-flop respond by producing the control
> signal "off," thus turning off the device the patented
> invention is controlling.   Similarly, entering a
> predetermined sequence of predetermined tone signals (such
> as the tones * and 1), leads to the production of a
> sequence detection signal, which itself leads to the
> production of a corresponding control signal (such as
> "on"), thus turning on the controlled device.
>
> According to the detailed description, the gating means
> "assures that repetition of the '# ,1' (off) sequence will
> not result in turning the instrument on."  Similarly, the
> gating means "prevents production of the 'on' signals
> unless the instrument is in the off state.   Hence,
> repetition of the sequence '*,1' will not turn the
> instrument 'off,' if it is already in the 'on' state."

*Casio Phonemate, Inc*, 105 F. Supp. 2d at 865 (quoting '900 Patent,
col. 6, ll. 18-20, 33-36).  Without the gating means, the controlled

device would "toggle" on or off irrespective of which control code had been entered.

> Turning now to the operation of the MVP, Jackson observes that
>
> the MVP will "play a message" (the first message) when the subscriber presses "1" at the beginning of a session. While the message is playing (*i.e.*, when the device is in the state associated with the sequence detection signal for "play first message" for that mailbox), several DTMF [dual-tone multifrequency] key options are available. But critically, when the subscriber presses "1" again, *the "play first messages" signal is not re-generated.* Instead, a very different signal is generated within the Glenayre device, namely the "keep message new and play the next" signal (*i.e.*, a type of "skip message" signal).

(Resp. at 9-10 (citations omitted; emphasis in original).) From this Jackson concludes that the MVP performs the identical, or an equivalent, function of the gating means and thereby infringes the '900 patent. Jackson is entirely mistaken.

First, as a foundational matter, in the '900 patent each "sequence detection signal" corresponds to a unique "predetermined sequence of tone signals" (for example, "*,1"). *See* '900 Patent Reexamination Cert. B2, col. 1, l. 64 - col. 2, l. 1. That predetermined sequence of tone signals is known as a "control code" or "control sequence." By the terms of the '900 patent, a "control signal" causing the controlled instrument to change its state (say, from "off" to "on") will only be produced *in response* to the production of a given sequence detection signal. *See id.*, col. 2, ll. 2-3 (describing a "control means *responsive* to said sequence detection signal for producing a corresponding control signal" (emphasis supplied)). Thus, to say, as the Court did in its CC

Order, that "the gating means . . . *prevent[s]* the production of a given sequence detection signal if the device is already in the state associated with that signal and the same tone sequence is entered a second time" *means* that a successive entry of the same control code (for example, "*,1" followed by "*,1") will not cause *any control response whatsoever* in the controlled device. Put simply, there can be no control signal (and therefore no change in the state of the controlled device) without a predicate sequence detection signal.

This articulation of the basic schema of the '900 patent makes plain the error of Jackson's position. He is contending that the MVP performs the function of the gating means simply because a different control signal results from a successive entry of the same control sequence. But the claimed function of the gating means in Claims 1 and 59 is not to produce a *different* control signal in response to the same control sequence, it is to "*disabl[e]*" outright the production of a given sequence detection signal (*i.e.*, the one corresponding to the control sequence entered) and thereby to *disable* the production of *any* control signal in response to a successive entry of the same control sequence. In the '900 patent, entering a given control code a second consecutive time is a non-event. Not so with the MVP. Because successive entry of the touch tone "1" causes the MVP to respond, it follows that the sequence detection signal associated with the tone entry "1" (which, in the language of the '900 patent, would be the relevant "predetermined sequence of predetermined tone signals" or control code) has *not* been disabled.

- 13 -

Given this, no reasonable jury could conclude that the MVP performs the identical, or an equivalent, function of the gating means. *Cf. Casio Phonemate, Inc*, 105 F. Supp. 2d at 867 ("[T]he accused device does not prevent production of the sequence detection signal associated with the tone sequence "*, 2." *Rather, every time the tone sequence "*, 2" is entered, the accused device appears to detect this sequence and respond to it.* If the accused device does not 'disabl[e] production of . . . detection signals,' it does not have a function identical to that of the gating means required by the '900 patent."). Accordingly, Glenayre's motion for summary judgment with respect to Claims 1 and 59 is granted.

### Claims 3 and 69

Glenayre next argues that no reasonable jury could conclude that the MVP performs the identical, or an equivalent, function of the "flip-flop means." Glenayre is again correct.

Independent claims 3 and 69 describe a

> flip-flop means associated with each said bistable operation, with said flip-flop means producing first state and second state output signals for each said bistable operation, said first state output signal corresponding to one of said mutually-exclusive operating conditions, and said second state output signal corresponding to the other of said mutually-exclusive operating conditions, and wherein said flip-flop means is responsive to a sequence detection signal selectively associated with one of said conditions of fewer than all of said bistable operations for changing from said first state output signal to said second state output signal for said fewer than all of said bistable operations and is responsive to a different sequence detection signal selectively associated with the other one of said conditions of fewer than all of said bistable operations for changing from said second state output signal to said first state output signal for said

fewer than all of said bistable operations, and maintaining
the state of said flip-flop means until and if and only if
said flip-flop means responds to a sequence detection
signal selectively associated with the other of said
conditions of fewer than all of said bistable operations,
said first and second state output signals comprising said
control signal.

'900 Patent Reexamination Cert. B2, col. 2, l. 66 - col. 3, l. 30,

col. 19, ll. 23-52. In its CC Order, the Court concurred with Judge

Gettleman's view of the function of the flip-flop means, construing

it as follows:

According to the plain language of Claim 3, the '900 patent
controls "bistable" operations, meaning operations that
have two mutually exclusive stable operating conditions
only. The two mutually exclusive operating conditions of
the preferred embodiment of [Jackson]'s patent are "on" and
"off." As [Jackson] explained to the patent office on
April 26, 1996, "a single flip-flop means 66 selectively
controls both of two, mutually exclusive, stable operating
conditions (e.g., 'ON' and 'OFF') of a bistable operation."
The language of Claim 3 and the detailed description
explain that entering a predetermined sequence of
predetermined tone signals (such as the tones # and 1),
produces a sequence detection signal, which itself produces
a corresponding control signal (such as "off"). As
explained in the claim language, *a specific and different
sequence detection signal is associated with each of the
two operating conditions, and part of the function of the
flip-flop means is to respond to different sequence
detection signals in different ways.*

The claim language reveals that *it is also part of the
function of the flip- flop means to maintain its state and
remain in one operating condition (e.g., on) "until and if
and only if" it receives the sequence detection signal
associated with the mutually exclusive operating condition
(e.g., off).* As [Jackson] explained while prosecuting the
patent: "*flip-flop means 66 maintains its state until it
responds to a sequence detection signal selectively
associated with the other of its two mutually exclusive
states. Neither the hanging up of the answering circuitry
. . . nor any other signal or operation can cause flip-flop
means 66 to change its state. It only changes its state*

- 15 -

> *when it receives a sequence detection signal[ ] selectively associated with its opposite state."*
>
> According to the plain language of the claim coupled with the detailed description, if the appliance is on, for example, it is part of the function of the flip-flop means to not turn the item off until it receives the sequence detection signal associated with the operating condition "off." When the flip-flop means receives this sequence detection signal, it is part of the function of the flip-flop means to produce an output signal corresponding to the operating condition "off," such as the control signal "off." It is also part of the function of the flip-flop means to turn the item back on only if it receives a different sequence detection signal, *e.g.*, the sequence detection signal selectively associated with the operating condition "on."

CC Order, Chart at 4 (internal quotation marks omitted; emphasis supplied).

Based on this construction of the function of the flip-flop means, repeating a control sequence (say, "*,1" followed immediately by "*,1") will not cause the controlled appliance to change its operating state. To take an example, assume that a device being controlled is currently in the operating state "off." Entering the control sequence "*,1" triggers the production of a corresponding sequence detection signal, which in turn triggers the production of the control signal "on," which turns the device on. While the device is in the "on" operating state, the flip-flop means functions to ensure that successive entry of the "on" control sequence "*,1" will not cause the device to turn off. Put another way, the flip-flop means functions to maintain the operating state of the device and to keep it in that condition "until and if and only if it receives the sequence detection signal associated with the mutually exclusive

operating condition." *Id.* Thus, in the present example, to turn the controlled device off one would need to enter the "sequence detection signal selectively associated with its opposite state", *i.e.*, "#, 1" for "off." *Id.* "Neither the hanging up of the answering circuitry . . . nor any other signal or operation can cause [the] flip-flop means . . . to change its state." *Id.*

In the MVP, certain conditions that are arguably "bistable" are "controlled exclusively by toggling the feature on or off through entry of the same command, not through entry of a different command." (Mot. Summ. J. at 14.) For example, Jackson notes that in the MVP the "date and time stamp" may be turned on and off by successively entering the touch-tone key pattern "4, 4, 2, 3." Likewise with certain other customizable features, such as message notification ("4, 4, 3") and constant touch ("5, 1"). One apparent benefit of this operating procedure is that it eliminates the need to use (and therefore keep track of) more than one control code.

Jackson argues, unconvincingly, that Glenayre's "toggling technique" is within the scope of Claims 3 and 69. He does so by suggesting that, even though the MVP can control bistable operations through the entry of the *same* control sequence, the MVP is nevertheless "us[ing] different *internal* signals for 'on' and 'off,' even when the same DTMF key pattern is used to toggle." (Resp. at 14 (emphasis supplied).) Jackson continues: "For instance, the date and time stamp DTMF key pattern [4][4][2][3] will produce the 'turn date and time stamp on' signal *only* when the pre-existing state of

the date and time stamp is 'off;' it will produce the *different* 'turn date and time stamp off' signal *only* when the pre-existing state of the date and time stamp is 'on.'" (*Id.* at 13 (emphasis in original).)

Jackson's argument is nonsense and betrays a basic misunderstanding of the '900 patent's limitations. Jackson's key conceptual error is his attempt to cleave the critical connection in the '900 Patent between a "control sequence" (consisting of a particular predetermined sequence of predetermined tone signals such as "*,1") and its corresponding "internal [sequence detection] signal." Jackson wants to argue that the '900 patent somehow reads on devices that use the *same* control sequence to change a device from one bistable operating condition to another (*e.g.*, toggling the MVP's "date and time stamp" feature on and off by successive entry of the key pattern [4][4][2][3]). If Jackson's argument were valid, it would mean that, in the '900 patent, after a user had entered "*,1" and turned a device on, a successive entry of "*,1" could turn the device off by somehow stimulating a different "internal" sequence detection signal. Such a conception is at manifest odds with the plain meaning of the '900 patent.

In the '900 patent, a given sequence detection signal can only be produced by entering a particular control code. *See* '900 Patent Reexamination Cert. B2, col. 1, l. 64 – col. 2, l. 1. A "control signal" causing the controlled instrument to alter its state (say, from "off" to "on") will only be produced *in response* to the production of a given sequence detection signal. *See id.*, col. 2,

- 18 -

11. 2-3. Thus, as explained in the discussion of Claims 1 and 59, the '900 patent requires that successive entry of the same control code have no effect whatsoever on the operating condition of the controlled device. If, as Jackson concedes, "different [sequence detection] signals are generated" in the MVP using the *same* toggled touch-tone key pattern (Resp. at 13), then it cannot be true that the MVP "only changes its state when it receives a sequence detection signal selectively associated with its opposite state," CC Order, Chart at 2. This is because, as emphasized above, the "sequence detection signal selectively associated with [a device's] *opposite* state" can only be generated in the '900 patent by entering a *different* control code. Through toggling, the MVP can change its operating condition upon repetitive entry of the *same* control code, and this takes it outside the functional scope of the flip-flop means in Claims 3 and 69.

As a matter of law, therefore, no reasonable jury could conclude that the MVP performs the identical, or an equivalent, function of the flip-flop means. Accordingly, Glenayre's motion for summary judgment with respect to Claims 3 and 69 is granted.

### *Claims 5 and 79*

Glenayre next claims that Jackson has failed to create a genuine issue as to whether the structural components within the MVP (including any algorithm(s) used by its microprocessor(s)) are programmed to perform the function of the "access limiting circuit means" in substantially the same way as the corresponding individual

digital logic circuit elements described in the '900 patent. While it is a close call, the Court holds that a genuine issue exists on this point.

Claims 5 and 79 call for an "access limiting circuit means coupled with said detecting means for preventing production of said sequence detection signal until an access sequence comprising a further predetermined sequence of predetermined tone signals is first received on said phone line." '900 Patent Reexamination Cert. B2, col. 3, ll. 58 – 66, col. 22, ll. 31-38. In its CC Order, the Court construed the function of the access limiting circuit means as follows:

> According to the plain language of the claim, the function of the '900 patent's access limiting circuit means is to prevent a sequence detection signal from being produced until after the phone line receives a predetermined sequence of predetermined tone signals. In essence, it is the function of the access limiting circuit means to prevent a user from accessing a mailbox unless she first enters an access code.

CC Order, Chart at 5 (internal quotation marks omitted). The Court also held that the following structures correspond to the access limiting circuit means:

> Break-in prevention system 25; relay 90 and integrated circuits including AND gates 55, 100, 102, 104, 108, 112, 116, 118 and 126, OR gates 85 and 120, exclusive OR gate 95, flip-flops 106, 110, 114 and 122, counters 70 and 124, buffer 88, inverter 125.

*Id.*

In the preferred embodiment of the '900 patent, the required access code – which is comprised of "touch-tone signals corresponding

to 7, 6, 5, x, where x can be any signal at all ('don't care' or dummy signal)," '900 Patent, col. 8, ll. 21-23 - is recognized one digit at a time. (Technically, this "access code" consists only of the digits "7, 6, 5"; as will be discussed later in this opinion, the entry of dummy signals, while necessary, is simply filler.) An important consequence of this method of operation is that if a digit in the access sequence is entered incorrectly, the structure of the access limiting circuit means will not permit the circuitry to recognize any subsequent digits of the access code that are entered. If, for example, a user were to enter "7, 8, 5, x," the apparatus described in the '900 patent would not recognize entry of the digit "5."

Simplifying the relevant structure for purposes of explanation, we can say that this one-digit-at-a-time verification procedure is accomplished through a chain of three interlinked flip-flops (106, 110, and 114). *See generally* '900 Patent, col. 8, l. 19 - col. 9, l. 18; (Silva Dep. at 186-91, 196). Assuming "7, 6, 5, x" is the access code, the apparatus of the '900 patent works as follows: If a user initially enters a "7," then a logic 1 is clocked at the Q output of flip-flop 106. If the next digit entered is a "6," then because the previous digit ("7") was also entered correctly, a logic 1 is clocked at the Q output of flip-flop 110. Likewise with entry of the third digit - if a "5" is entered, then because the previous digit ("6") was also entered correctly, a logic 1 is clocked at the Q output of flip-flop 114. Once this chain of flip-flops has sequentially

recognized entry of the three digits of the access code, the logic 1 output of these three flip-flops is loaded into a final flip-flop 122. Meanwhile, as the access code was being entered, a component referred to as "counter 124" has been counting the number of tones coming in; once four tones have been entered, counter 124 clocks flip-flop 122. If flip-flop 122 has the logic 1 loaded at the time it is clocked by counter 124 (as it would in the foregoing example), it then permits the sequence detection means to begin detecting signals (*i.e.*, the user is allowed access to the system).

If, however, the user had incorrectly entered the access code as "7, 8, 5, x," a logic 1 would not have been clocked at the Q output of flip-flop 110, and therefore not at the Q output of flip-flop 114. As a result, the structure of the access limiting circuit means would not have recognized entry of the digit "5." Since a logic 1 would not have been clocked through the entire chain of flip-flops (from 106 to 110 to 114) and loaded into the endpoint at flip-flop 122, this access code entry failure would ultimately mean that the sequence detection means would be prevented from detecting signals (*i.e.*, the user would be denied access to the system). As Dr. Silva put it, "[i]f an incorrect digit is entered after a correct digit is entered, a 'zero' will be passed along the counter chain and eventually deny access to the user." (Silva Dep. ¶ 28.)

In contrast, the MVP does not check each digit of the access code (or "password") as it is entered and does not defer checking subsequent digits of the access code until the earlier digits are

- 22 -

entered correctly. In the MVP, the collection of access codes involves three separate microprocessors: the central controller, one of several time space controllers ("TSC"), and one of several digital signal processors ("DSP"). (*See generally* Bettis Decl. at ¶¶ 14-20.) The central processor first determines whether an access code is necessary; if so, it recalls the number of digits in the access code from a database and instructs the TSC to collect that number of digits. The DSP detects and decodes the touch-tones as they are entered, sending them to the TSC as 5-bit data packages. The TSC continues collecting digits until it either reaches the number of digits instructed by the central processor or until the subscriber enters "#." Once either event has occurred, the TSC forwards the string of digits (along with certain other identifying information) to the central processor. The central processor then recalls from memory the access code for that subscriber and compares the string of digits it has received from the TSC with the correct access code. If they match, the central processor grants the caller access to the main menu associated with that subscriber; if not, access is denied.

In bringing the instant motion, Glenayre does not contest that the MVP performs the identical, or an equivalent, function of the access limiting circuit means (which, as explained, is to prevent access to the system unless an access code is first received). Rather, Glenayre only tenders arguments related to structure. First, Glenayre argues in its reply brief that Jackson has failed to identify "precisely what structure in the Glenayre MVP is supposedly

equivalent to the access limiting circuit means." (Reply at 15.) This appears to be a demand that Jackson point to the particular components within the MVP that allegedly perform the function of the access limiting circuit means. As such, this argument comes too late, see *Stark v. PPM America, Inc.*, 2002 WL 31155083, at *7 (N.D. Ill. Sept. 26, 2002) (summary judgment movant cannot raise new arguments or legal theories in reply brief), and in any event is not convincing, as Dr. Silva *has* highlighted (or at least sufficiently so to survive summary judgment) the specific structures in the MVP that assertedly perform the function of the access limiting circuit means (see Silva Decl. ¶ 26; Silva Fed.R.Civ.P. 26(a) (2) Expert Report). Glenayre's second (and only other) argument is that no reasonable jury could conclude that the MVP and the structure disclosed in the '900 patent perform that function in substantially the same way. Put more precisely, Glenayre claims that no reasonable jury could conclude that the MVP's string-compare password validation technique is insubstantially different than the '900 patent's one-digit-at-a-time password validation technique.

In analyzing disputes of this nature at the summary judgment stage, the Federal Circuit has admonished district courts not to "conduct[] an impermissible component-by-component analysis to determine that no reasonable jury could find structural equivalence." *Caterpillar Inc.*, 224 F.3d at 1380. "It is of course axiomatic that each element contained in a patent claim is deemed material to determining the scope of the patented invention." *Odetics*, 185 F.3d

- 24 -

at 1268. However, "[t]he individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations. Rather, the claim limitation is the overall structure corresponding to the claimed function." *Id.*

Given this cautionary guidance from the Federal Circuit, the Court feels constrained to conclude that a genuine issue exists as to whether the MVP performs the access limiting circuit means of Claims 5 and 79 in "substantially the same way" as the structure disclosed in the '900 patent. Based on the parties' submissions, all that can fairly be said at this point about the "overall structure that corresponds to the claimed function" of the access limiting circuit means is that it checks a user's password one digit at a time. The MVP, on the other hand, eschews the digit-by-digit approach and instead checks a subscriber's access code as a single string of digits. While this shows a literal operational difference, Glenayre has not persuaded the Court that its technique is necessarily substantially different. Glenayre has not identified any distinguishing advantages (for example, enhanced utility, greater efficiency, etc.) that the MVP's single-string procedure offers over the digit-by-digit method described in the '900 patent, and the Court is unable to discern any on its own. From the evidence made available to the Court, a reasonable jury *could* find structural equivalence between these two methods. Accordingly, Glenayre's motion for summary judgment with respect to Claims 5 and 79 is denied.

### Claims 15 and 112

Finally, Glenayre argues that Jackson has failed to set forth evidence from which a reasonable jury could conclude that the MVP performs the identical, or an equivalent, function of either the "counter means" or the "disabling circuit means." Glenayre is correct.

Claims 15 and 112 describe a: (i) "counter means for producing a count signal upon counting a predetermined number of received tone signals greater in number than the number of tone signals in said access sequence," '900 Patent Reexamination Cert. B2, col. 5, ll. 62-66, col. 30, ll. 49-53; and (ii) "disabling circuit means responsive to said count signal and said gate signal for disabling production of said sequence detection signal when said access sequence is not present in said predetermined number of received tone signal[s]," *id.*, col. 5, l. 67 – col. 6, l. 4, col. 30, ll. 54-59. In its CC Order, the Court held that "[i]t is the function of the counter means to produce a count signal upon counting a predetermined number of received tone signals greater in number than the number of tone signals in the access sequence." CC Order, Chart at 7. The Court held that "[i]t is the function of the disabling circuit means to disable production of a sequence detection signal if the access sequence is not present in the predetermined number of tone signals counted by the counter means." *Id.*

As indicated in the previous discussion of Claims 5 and 79, the device disclosed in the '900 patent will not respond unless at least

- 26 -

one "dummy" tone is entered *in addition* to the access code. *See* '900 Patent, col. 8, ll. 19-23, col. 9, ll. 19-25. The rationale behind dummy signals in the '900 patent is to allow the user flexibility in creating a password and to provide greater protection against unauthorized access to the system. Dr. Silva confirmed this rationale at his deposition:

> Q: Now, why would you want to count more than the number of tone signals in the access sequence?
>
> A: Well, there's that - that gives you additional protection. You can - you could have a system that would - if you counted, it would just say, okay. I'll let you put in eight digits, but three in a row of them have to be the right ones before I grant you access. It gives you - well, let's put it - protection isn't such a good word. It gives you a little bit of flexibility. You might miss the - you might say I'm putting in my access code here, and I think it's 765, but it might be 7658. But I'm the authorized user, and so it lets me put in an extra digit in this particular example, and it won't hurt anything.

(Silva Dep. 222, ll. 3-20.).

Although in the preferred embodiment of the '900 patent the "access sequence compris[es] touch-tone signals corresponding to 7, 6, 5, x, where x can be any signal at all ('don't care' or dummy signal), . . . any number of signals in any given sequence may be utilized, including any number of desired 'don't care' or dummy signals at any point in the sequence, without departing from the invention." *See* '900 Patent, col. 8, ll. 19-23, col.9, ll. 21-25. For example, a user could designate a three-digit password that is followed by seven dummy signals: "7, 6, 5, x, x, x, x, x, x, x." Then, even if an unauthorized user somehow obtained the password ("7,

6, 5"), he would be denied access to the system if he entered anything fewer than ten digits.

The structure corresponding to the counter means – a component dubbed "counter 124" – is responsible for counting the entry of tone signals making up the access code and any required dummy signals; upon receiving the appropriate number, it generates a "count signal" which is fed to flip-flop 122. If the access code has otherwise been properly entered, the device disclosed in the '900 patent will then permit the production of sequence detection signals in response to control codes (*i.e.*, the user will be allowed access to the system). If, however, "the access sequence is *not* present in the predetermined number of tone signals counted by the counter means," CC Order, Chart at 7 (emphasis supplied), the disabling circuit means will prevent the user from accessing the system.

In sharp contrast, the MVP does not require "dummy signals" to be entered along with an access code before a subscriber is granted access to its system. Rather, the TSC collects the exact number of digits equal to a subscriber's access code and then sends that string to the central processor for validation. If the password matches, access to the system is granted; if not, access is denied. If the correct access code has been entered and the subscriber *continues* to enter tone signals, the MVP will interpret those additional keyed tones as control commands. Thus, phrased in the language of the '900 patent, the MVP does not count "a predetermined number of tone

signals *greater in number* than the number of tone signals in said access sequence" before accepting control commands.

"[T]he MVP allows three chances for a caller to get the password right." (Silva Decl. ¶ 27.) A "chance" in this context means a predetermined time period. Thus, if we were to set each time period at five seconds, a subscriber dialing up the MVP would be prompted for a password and then given three discrete, five-second periods within which to enter it correctly. If the subscriber accurately entered the password during the first time period, access to the system would be granted. If not, the subscriber would be given another five-second time period to enter the password, and so on through the third attempt. The MVP will automatically disconnect if a caller fails successfully to enter the proper access code within three attempts. (Reply at 17; *cf.* Bettis Dep. at p. 175, l. 22 - p. 177, l. 10.)

Jackson contends that this particular *modus operandi* is covered by the counter means and the disabling circuit means in the case

> where a subscriber has entered a password incorrectly the first (or the first and second) time, but then gets it right the second (or third) time. . . . [I]n those situations, the MVP (namely, the TSC part of the MVP) has counted two or three times the number of tones in the access sequence before permitting access. If a password were *four* digits, for example, a person who got it wrong the first time but right the third time has made the TSC part of the MVP count *twelve* tones.

(Resp. at 21 (emphasis in original).) This is a specious argument that rests on the well-worn logical fallacy *post hoc ergo propter hoc.*

The MVP is not "counting" previously misentered tone signals as a precondition (in the form of a required number of "dummy tones") to accepting a password. Rather, the MVP is simply "counting" the number of predetermined time periods that have been exhausted without a successful password entry. After the third failed attempt, the MVP disconnects the call. Suppose, for example, that my MVP password is "7, 6, 5." If I miskey my password as "7, 6, 4" during the first set time period, the MVP will "count" that as one failure. If I again enter "7, 6, 4" during the second time period, the MVP will "count" that as a second failure. If I then finally get it right on the third try and enter "7, 6, 5," the MVP will allow me access to the system, *not* because of any tone signals that I (mis)entered on the first and second attempts – that is, not because the MVP has somehow "count[ed] a predetermined number of received tone signals greater in number than the number of tone signals in said access sequence" – but rather because I entered the correct three-digit password during one of the three distinct time periods allowed for password entry.

The only opposing "evidence" that Jackson offers to support his argument is a single, highly conclusory statement from Dr. Silva to the effect that, if an MVP subscriber doesn't get his password right until the second or third try, "the MVP . . . has counted two or three times the number of tones in the access sequence before permitting access." (Silva Decl. ¶ 27.) Even to the extent this statement is true, it is irrelevant. That is, while it might be said that *within each discrete time period* the MVP "counts" the tones

entered as part of its password validation procedure, it does not follow that the tones constituting a previously misentered password are "counted" for purposes of password validation in any *subsequent* discrete time period.  A simple analogy might help emphasize this distinction:  Suppose I am playing a carnival game in which I am promised a prize if I can toss three balls into a basket.  I am allowed three tries, and on each try I am given just three balls. All three of the balls must land in the basket during a single, discrete try for me to win; if I fail to toss all three balls into the basket on a given try, they are all handed back to me.  Suppose that I fail in my first and second attempts, but succeed in my third. The carney then hands over the prize and I walk away a winner.  The critical point in this analogy is that I won the prize *not* because of anything that happened in my first or second attempts, but *only because of my successful, self-contained third attempt*.  While I am playing the game, the carney is only "counting" two things:  the number of balls that I land in the basket on any given try (three in is a winner), and the number of tries I have used up at any given point (three failed attempts and the game is over).  The fact that I may have landed some, or even none, of the balls in my first or second attempts is totally irrelevant to my winning the prize.

Jackson has failed to adduce evidence from which a reasonable jury could conclude that the MVP performs the identical, or an equivalent, function of either the counter means or the disabling

circuit means. Accordingly, Glenayre's motion for summary judgment with respect to Claims 15 and 112 is granted.

## MOTION TO STRIKE

One final ancillary matter must be resolved. On January 14, 2003, Jackson filed a "motion to strike" certain arguments that Jackson claims were raised for the first time in Glenayre's reply brief. In particular, Jackson claims that Glenayre's reply brief impermissibly argued for the first time that Jackson's interpretation of the range of '900 patent equivalents would ensnare the prior art (specifically, the prior art of U.S. Patent No. 4,371,752). *Cf. Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1367 (Fed. Cir. 2002) ("[T]he doctrine of equivalents cannot extend so broadly as to ensnare prior art.") Jackson is correct. Because this argument was first raised in reply, it is waived. *See Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 439 (7th Cir. 1994)("In most circumstances, a litigant who fails to raise an argument until his reply brief will be deemed to have waived that argument."); *Edwards v. Honeywell, Inc.*, 960 F.2d 673, 674 (7th Cir. 1992)(district court may not grant summary judgment on ground first raised in reply). The fact that Jackson would bear the ultimate burden of proof on the ensnarement issue does not excuse Glenayre from properly raising it in its motion for summary judgment, thereby allowing Jackson, and the Court, the benefit of a full response. *Cf. Celotex Corp.*, 477 U.S. at 323 ("[A] party seeking summary judgment

- 32 -

always "bears the initial responsibility of informing the district court of the basis for its motion . . . .").

Jackson also suggests that Glenayre failed to argue in its motion for summary judgment that the MVP does not infringe the '900 patent under the doctrine of equivalents. This argument is not well-taken. Glenayre's complaint seeks a broad declaratory judgment of non-infringement. (Compl. ¶ 1.) Jackson's amended answer and counterclaim alleges that Glenayre directly infringes the '900 patent (Am. Countercl. ¶12.), and Jackson bears the burden of proof on this issue, *Under Sea Indus., Inc.*, 833 F.2d at 1557. It is elementary that direct infringement must either be shown literally or through the doctrine of equivalents. 69 C.J.S. *Patents*, § 400 (2002). Indeed, the Court provided a detailed discussion in its CC Order of both theories of infringement and noted that the core issue in this case is whether Glenayre infringes the '900 patent either "literally under 35 U.S.C. § 112, ¶ 6 or under the doctrine of equivalents." CC Order at 6. Glenayre's properly supported motion for summary judgment argues that Jackson has failed to make a showing sufficient to establish direct infringement for each of the eight disputed claims in this case. Glenayre is clearly challenging Jackson to create a genuine issue of material fact on infringement either literally or under the doctrine of equivalents. Accordingly, Jackson's motion to strike "Glenayre's discussion of the doctrine of equivalents" from its reply brief is denied.

To the extent Jackson's motion to strike raises other issues, it is denied.

## CONCLUSION

For the foregoing reasons, Glenayre's Motion for Summary Judgment with respect to Claims 1, 3, 15, 59, 69 and 112 of the '900 patent is **GRANTED**. Glenayre's Motion for Summary Judgment with respect to Claims 5 and 79 of the '900 patent is **DENIED**. Jackson's Motion to Strike is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED**.

_____
Harry D. Leinenweber, Judge
United States District Court

Date: _February 18, 2003_