UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GLENAYRE ELECTRONICS, INC., a Colorado corporation, | Civil Action No. 02 C 0256 |
| Plaintiff, | |
| v. | Honorable Harry D. Leinenweber |
| PHILIP JACKSON, an individual, | Magistrate-Judge Ian H. Levin |
| Defendant. | |
| PHILIP JACKSON, an individual, and PMJ FAMILY LIMITED PARTNERSHIP, | |
| Counterclaim-Plaintiffs, | |
| v. | |
| GLENAYRE ELECTRONICS, INC. and PRIMECO PERSONAL COMMUNICATIONS, L.P. | |
| Counterclaim-Defendants. | |

DOCKETED MAR 2 0 2003

FILED MAR 1 9 2003 WP
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**PHIL JACKSON'S OPPOSITION TO
GLENAYRE'S MOTION *IN LIMINE* TO
LIMIT LEROY SILVA'S TESTIMONY AT TRIAL**

I. **INTRODUCTION**

Glenayre's motion to limit Dr. Silva's testimony should be denied because all of the supposedly "new" information Glenayre complains about is contained in his expert report or solely developed to address evidence and arguments Glenayre was under a duty to disclose, but withheld until the last minute. Such rebuttal testimony, of course, need not be disclosed in reports. See, e.g., Finley v. Lindsay, 1999 U.S. Dist. LEXIS 12261, *16 (N.D. Ill. 1999) ("It would be totally unfair to prohibit rebuttal evidence ... the FPTO is not intended to require the identification of



rebuttal witnesses or evidence other than those that the party then reasonably expects to proffer at trial.").

If there is to be any limitation on testimony, it should be to preclude Glenayre from using its identified expert Samuels, or its stealth expert Bettis, to opine on alleged non-infringement. But Mr. Jackson is not seeking to limit their testimony at this time, only to be given a fair chance to respond to it. Mr. Jackson cannot be blamed that Glenayre's new non-infringement contentions were essentially hidden from Mr. Jackson until weeks ago.

## II. THE COURT ALREADY REJECTED GLENAYRE'S ARGUMENTS

This Court previously denied Glenayre's nearly identical motion to strike Dr. LeRoy Silva's December 4, 2002 summary judgment declaration (Exhibit A). That ruling has apparently not stopped Glenayre from recycling its unsuccessful arguments here. Mr. Jackson previously pointed out that Glenayre elicited tardy expert testimony of its employee Bettis that was never disclosed in discovery. Here is a quote from our prior brief responding to Glenayre's earlier (unsuccessful) motion to strike:

> Although Glenayre accuses Mr. Jackson of sandbagging, the fact is it's the other way around. For instance, Glenayre submitted its Declaration of Sonny Bettis in support of its motion for summary judgment of noninfringement. (Exhibit E). Mr. Bettis gave "expert" type opinions on infringement, but never submitted a Rule 26 expert report. Nor was he even identified by Glenayre as its expert. Mr. Bettis's declaration contains testimony *beyond* what he stated at his deposition. He made contentions that Glenayre had never made before, and Bettis's declaration could not be tested with cross examination since discovery had closed. In contrast, Mr. Jackson submitted a proper Rule 56(c) declaration to explain why these new contentions did not negate Glenayre's infringement.

Revisiting old losing arguments, as Glenayre does here, is not a constructive use of this Court's time.

2

To ask this Court to take a fresh look at a fully briefed, argued and decided issue is to do what this Court decried in Quaker Alloy Casting Co. V. Gulfco Indus., Inc., 123 F.R.D. 282, 288 (N.D. Ill. 1988):

> [T]his Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure. Motions such as this reflect a fundamental misunderstanding of the limited appropriateness of motions for reconsideration.

Pickett v. Prince, 5 F.Supp.2d 595, 597 (N.D. Ill. 1998) (footnote omitted).

Here, exposing Glenayre's use of Bettis to violate the Rules did not deter Glenayre from doing it again. In its "supplemental" summary judgment motion filed just weeks ago (really, a motion to reconsider), Glenayre submitted yet another improper declaration of Bettis, containing yet new contentions. Once again, we pointed out in our briefing that Glenayre's tactics necessitated a responsive declaration from Dr. Silva:

> When Glenayre's technical witness, Mr. Bettis, was asked in his deposition to explain the factual basis for Glenayre's non-infringement position, he testified he could not:
>
> Q    If I were to go through each of the paragraphs where Glenayre's [interrogatory] response says that none of its products includes the particular claim limitations being discussed, would you be able to give me a detailed explanation of why that is so?
>
> A    No. I do not believe I could.
>
> (Deposition of Sonny R. Bettis, 08/15/02 at 240-41, Exhibit FF). Less than 90 days before trial, however, Mr. Bettis has suddenly become knowledgeable about a technical area to which he professed ignorance at his deposition; he offers *new* expert testimony about the advantages of the Glenayre structure in violation of Fed.R.Civ.P. 26(a)(2) and 37(c)(1). See Kw Plastics v. United States Can Co., 199 F.R.D. 687, 688-89 (M.D. Ala. 2000) (holding employee's expert testimony subject to Rule 26(a)(2) report requirement). Mr. Gafford's and Dr. Silva's rebuttal testimony, therefore, simply responds to Mr. Bettis' untimely expert testimony (Rule 26(a)(2) allows rebuttal expert testimony 30 days after receipt of the opposing expert testimony; Rule 56(c) allows opposing affidavits anytime "prior to the date of hearing.").

3

Glenayre's motion fails to address these controlling facts and law.

Finally, Glenayre's first expert, Mr. Samuels, gave virtually no basis in his reports for his "opinions" of non-infringement. For example, aside from saying in conclusory fashion that certain means elements are absent, Mr. Samuels says nothing about alleged non-equivalency of structure (Exhibit B). Scour those reports as we may, we find no hint of the litany of so-called "advantages" or "differences" that Bettis now claims are central to noninfringement. Compare Dr. Silva's detailed discussion of infringement (Report, Exhibit C) with Mr. Samuels' terse discussion of non-infringement (Exhibit B). Nor did Glenayre provide details of its current non-infringement contentions in response to Mr. Jackson's interrogatory answers (Exhibit D).

Was Bettis Glenayre's main expert all along, coached to reveal nothing of his opinions during his deposition? We do not know. But we do know it would unfairly prejudice Mr. Jackson, and confuse the jury, if Bettis is permitted to give his new expert opinions, but Dr. Silva forbidden to address them.

### III. DR. SILVA WILL NOT TESTIFY BEYOND THE SCOPE OF HIS ORIGINALLY REPORTED EXPERT OPINIONS

In any event, Glenayre's motion is at least premature, since Dr. Silva does not intend to go beyond the opinions he originally expressed unless Glenayre comes up with new theories of non-infringement. Nor do his two summary judgment declarations, or Mr. Jackson's demonstrative exhibits, do so. Dr. Silva will discuss digital logic, the '900 patent, microprocessors, digital logic/microprocessor equivalency under the right circumstances, and such equivalency here under the facts of this case. Glenayre cannot feign surprise that this will be his testimony. Indeed, even in responding to Bettis in his two summary judgment declarations, Dr.

4

Silva did not, and did not have to, go beyond the already comprehensive scope of his original expert report.

Dr. Silva submitted his thorough, complete expert report on September 9, 2002 (Exhibit C). As of then, of course, Glenarye had provided no meaningful non-infringement contentions. Those had to await not one, but two, summary judgment motions. Dr. Silva spent several report pages explaining details of why Mr. Jackson's discrete logic circuitry is at least equivalent to Glenayre's hardware plus software logic circuitry when performing the claimed functions. In the body of his report, he introduces the issue of equivalence of structures:

> I shall begin my discussion by addressing an issue that is a factor in this case. The Glenayre MVP is implemented in both software and hardware. The Jackson '900(B2) Patent describes a system implemented with hard-wired logic. The Glenayre MVP system is controlled by microprocessors. But these microprocessors, along with their associated electronic systems, function as a hard-wired logical structure.

(Exhibit C). He then goes on to explain that logic circuits are "building blocks" of larger circuits:

> Small scale and medium scale integrated circuits are often used to implement logical functions. These circuits appear in the form of OR gates, AND gates, Exclusive OR gates, negation equivalents, Flip-Flops (RS, JK, D, etc.) etc. A logical system is usually coordinated with a system clock. Using these basic building logical blocks, any logical system can be implemented.

(Exhibit C). Dr. Silva continues that microprocessors contain these same building blocks as appear in Mr. Jackson's '900 patent:

> A microprocessor contains functional blocks referred to as a Program Counter, ALU (Arithmetic Logic Unit), ROM (Read Only Memory), RAM (Random Access Memory), Instruction Register, Instruction Decoder, Memory Address Register, Input-Output units, etc. A system clock coordinates these blocks. A microcontroller contains functional blocks referred to as a CPU, a SIM (System Integration Module), a Queued Serial Module (QSM) and a General Purpose Timer (GPT) that interface through a common Intermodal Bus (IMB). The modules are coordinated with a system clock.

> The functional blocks of a microprocessor are implemented with arrays of logical gates (OR, AND, etc.) and flip-flops. The same is true for a microcontroller. Thus, we see that a logical system implemented by a microprocessor is electronically (structurally, in way and result) and functionally equivalent to a logical system implemented by small scale, medium scale, or large-scale integrated circuits or, for that matter, by discrete electronic components.
>
> Software, resident on computers, is used in the computer-aided design (CAD) process of many electronic systems. When the design is complete, the software remains in the CAD computer system and is not resident in the electronic system that was designed. Such is the case in microprocessors with fixed ROM's.

(Exhibit C). Notably, Glenayre has never called into question Dr. Silva's opinions. But his report does not stop there. He goes further, to explain that when the *logical* structure of Mr. Jackson's patent is carried out in microprocessor form, that is not a substantial difference. Dr. Silva specifically incorporates the pertinent facts discussed in decisions of both the Court of Appeals in a hardware/software case, and of the Southern District of Indiana concerning the very Jackson '900 patent-in-suit here:

> In summary, it makes no difference how the logical structure of Jackson '900(B2) Patent is carried out (discrete components, small scale integrated circuits, medium scale integrated circuits, large scale integrated circuits, microprocessors or microcontrollers) the way and result are the same, or at least substantially so.
>
> Hardware/software interchangeability has been widely recognized, even in the patent context. See, e.g., Overhead Door Corp. v. Chamberlain Group, Inc., 194 F.3d 1261, 1269-70 (Fed. Cir. 1999) (explaining the well known "hardware/software" tradeoff); Jackson v. Thomson Consumer Electronics, Inc. (IP 98-1712-C-Y/G, S. D. Ind.), January 16, 2001 Order at 8-9 ("a microprocessor programmed to perform the functions of the '900 patent is the equivalent, under Section 112, Paragraph 6, of the digital logic integrated circuitry disclosed in the '900 patent.").
>
> Michael Slater explains "The basic digital logic structure is the gate. All digital logic systems, including microprocessors, are composed of gates. While the major functions in a microprocessor system are performed by the LSI and VLSI microprocessors, peripherals, and memory devices, SSI and MSI 'glue' devices (such as gates, flip-flops, and decoders) serve to connect the more complex devices

6

> together and to translate control signals from one device to match those required by another." Slater, <u>Microprocessor-Based Design: A Comprehensive Guide to Hardware Design</u> at 3 (Prentice-Hall).
>
> In sum, both hard wired logic and microprocessor logic use combinational and sequential logic circuitry. They are interchangeable, and have been known to be interchangeable for some time.

(Exhibit C). Dr. Silva then shows how he applied these principles to his understanding of how the Glenayre MVP works (an understanding Glenayre has never challenged), and how the MVP infringes:

> The principal Glenayre platform at issue is the MVP 4240 system. This is a modular voice processing system that features 240 ports capable of serving thousands of subscribers. The system is encased in a 6-shelf cabinet and includes a Central Processing Unit (CPU), a Time Space Controller (TSC), T1/E1 interface cards, Digital Signal Processor (DSP) cards, disk memories, and other electronic equipment and power supplies. The TSC and CPU are Motorola 68000 family microprocessors. Of course, they are supported by necessary electronics on their circuit boards to enable them to operate. The TSC is the interface between the CPU and the DSP cards. The TSC is responsible for many tasks that include passing data between the CPU and DSP cards and switching digitized voice data onto or off the system buses. The TSC is also responsible for a variety of other switching functions. The Glenayre MVP 4240 is able to accept analog standard dual tone multiple frequency (DTMF) tones, and convert them to digital signals such as is done in the Jackson '900(B2) Patent.

(Exhibit C). He also attaches detailed claim charts at the end of his report, including for claims 5 and 79. In fact, his report expressly directs the reader to those charts for the infringement details:

> Both the hard wired logic of the '900 patent and the microprocessor logic that determines the Glenayre MVP functions contain an amalgam of combinational and sequential logic circuits. In both cases, the sequential logic aspects of the circuitry preserve a representation of an input state in an electrical form so it may be acted upon by the combinational logic. See the accompanying charts for specific illustrations.

7

(Exhibit C). In those claim charts he explains the access limiting circuit means equivalency this way, clearly showing that he intends to rely on pages 157-178 of Mr. Bettis's testimony, as well as any software Mr. Bettis discussed:

> The MVP has an access limiting circuit means coupled to the sequence detection means. The access limiting circuit means is the TSC and central controller microprocessors executing the code that provides the logic for restricting access to a subscriber's account. See Bettis Dep. at 157-78, and Ex. 43 (getaccnt.c source code). These microprocessors under the control of the source code are special purpose machines including control logic, gates, inverters counters and flip-flops of the access limiting circuit means. These structures requires users to enter their password before performing messaging functions. The MVP will not produce the sequence detection signal that corresponds to the tone signals for messaging functions until it has received the multiple digit DTMF sequence previously selected by the user as the password. These structures operate in substantially the same way as the '900 patent corresponding structures: like the '900 patent's corresponding structure, the microprocessors under the control of the source code are a special purpose machine including gates, flip-flops and inverters. The result is substantially the same: access is prevented until the correct predetermined tone signals are entered.

(Exhibit C). In those same claim charts, he explains the gate means equivalency this way, again specifically referring to the software, and Mr. Bettis's explanations:

> Within the MVP access limiting circuit means is a gate means (a central microprocessor executing the getaccnt.c logic that provides for normally preventing access to a subscriber's account) to prevent the user from performing messaging functions until receipt of the subscriber's DTMF sequence corresponding to the subscriber's private password. See Bettis Dep. at 176-77 (all cases except Case 0, i.e., Cases 1 through 5). The way and result are substantially similar to those of the '900 patent: use of a special purpose logic machine including gates, flip-flops and inverters, and normally preventing execution of the main sequence detection logic.

(Exhibit C). He also explains the counter means equivalency this way, once again, clearly showing his intention to rely on the software and Mr. Bettis's discussion of it:

> Within the MVP access limiting circuit means is a counter means (a TSC microprocessor executing the logic that provides for counting the prescribed

> number of DTMF digits). See Bettis Dep. at 172-73 (TSC told how many digits to collect, i.e., the "predetermined number"; then once collected TSC gives "enable operation" signal to central controller in the form of a d5 stimulus). The way and result are substantially similar to those of the '900 patent: use of a special purpose logic machine including gates, flip-flops and inverters, and enabling operation of further control logic when the full count of digits has been entered.

(Exhibit C). Not surprisingly, Mr. Jackson was able to show in table format in his earlier-filed response to Glenayre's unsuccessful motion to strike how *all* of the opinions and analyses in Dr. Silva's summary judgment declaration originated in his expert report.

For Glenayre now to say that Dr. Silva must ignore the '900 patent, the Glenayre software, or the Bettis arguments because Glenayre is "surprised" that Dr. Silva will be talking about these things is preposterous. How, for example, can Glenayre express shock (as it does on page 3, footnote 2) that Dr. Silva will testify about substantial similarity between the '900 and MVP structures? That's the only infringement issue in the case!

## V. SPECIFIC OBJECTIONS CAN BE MADE AT TRIAL

Other than "the sky is falling," it is hard to understand what Glenayre is really complaining about (Glenayre Br. 5, "a recipe for disaster at trial."). Glenayre only cites one or two specific matters Dr. Silva supposedly should not tell the jury. Page 4 of Glenayre's motion lists some proposed demonstrative exhibits, but Glenayre does not explain why Dr. Silva (or Mr. Jackson) cannot use them to illustrate his testimony (or any other witness's testimony) or how the patent (or the MVP) works. Glenayre does not even show them to the Court. During trial, the Court is entirely capable of receiving and resolving objections if any of Mr. Jackson's demonstrative exhibits really lack foundation. Those objections can be taken up in the context Glenayre has not provided in its motion.

The only specific matter that Glenayre complains about is paragraphs 13-14 of Dr. Silva's second declaration (which of course would not have been necessary had Bettis complied with the Rules and not submitted his tardy expert testimony). But those paragraphs only describe how the '900 patent works, clearly a subject well within the scope of Dr. Silva's original report and a matter beyond dispute. Namely, Glenayre complains because Dr. Silva notes the "access limiting circuit means" of the '900 patent receives and stores digits in the password, and then verifies the password at flip-flop 122. But this is true.

The patent itself at 8:36-37 says the flip-flops have *data input* (D) pins that respond to the individual password digits. "Data input" connotes receipt and storage. The patent continues, "Accordingly, if a '7' is decoded, a logic 1 is clocked from the D input to the Q output of flip-flop 106." '900 Patent at 8:39-41. This is also a description of receipt and storage of password digit information. Dr. Silva explained this at his deposition, which is testimony Glenayre admits it does not seek to exclude with this motion (Exhibit E, Silva Dep. at 186, lines 23-24: "[A] 1 gets *loaded into* Flip-flop 106."). "Loading into" the flip-flop is wording Dr. Silva used at his deposition, and clearly means storage in the flip-flop. So where is the harm to Glenayre in Dr. Silva stating these true facts, contained within the patent itself and discussed at his deposition? Does Glenayre want to preclude Dr. Silva from reading patent text into the record at trial, just because such text may not appear verbatim in his report?

Dr. Silva is also plainly right about verification. The patent itself at 8:64-9:16 states, "The Q output of flip flop 122 is here designated as the 'GOOD' signal, while the $\overline{Q}$ is designated as the 'BAD' signal, these two signals indicating whether or not the correct access code sequence

10

has been received.... Hence if the correct sequence has been entered, a logic 1 is clocked through to the Q output resulting in a 'GOOD' output signal. However, if the correct sequence has not been entered, the logic 1 is clocked to the $\overline{Q}$ output resulting in a 'BAD' output signal." And at 9:38-43 it states, "Thus, the clocking of the positive 1 upon completion of the correct entry code merely has the effect of leaving the 'GOOD' signal unchanged, whereas any incorrect attempt at entering the access code clocks the flip-flop 122 to produce the logic 1 or 'BAD' at the -$\overline{Q}$ output." Clearly, the "good" or "bad" validation happens after receipt and storage, as Dr. Silva will explain. The patent says so. Why is Glenayre so upset that Dr. Silva might explain the '900 patent? Where is the harm?

Glenayre also cannot find any contradiction between the Court's claim construction and Dr. Silva's testimony. In the Court's summary judgment Order, the Court makes its preliminary observations about the '900 patent "access limiting" means on an incomplete record ("Based on the parties' submissions, all that can be fairly said at this point is ...", quoted at Glenayre Br. 5). Dr. Silva merely amplified that this corresponding structure involves receipt and storage of a user's password one digit at a time. The language in the Order Glenayre relies on ("checking" one digit at a time) originates with Glenayre, who inartfully described the '900 patent this way in its original summary judgment papers. Harmonizing the Court's Order with what the '900 patent actually says is no sin. Dr. Silva's observations have not been "discredited" by the Court, as Glenayre argues. Instead, it reflects badly on Glenayre for trying to take advantage of the Court's "checking" terminology to make it appear as if the Court held the patent worked in a way

11

it clearly does not. Validation occurs at the appearance of "good" or "bad" at flip-flop 122, just as the patent says and just as Dr. Silva will explain.

## VI. ANY REBUTTAL TO BETTIS IS JUSTIFIED AND DID NOT HARM GLENAYRE

Glenayre's own cases, and Rule 37(c)(1) itself, reject exclusion if any allegedly untimely expert disclosure was substantially justified, or otherwise harmless. See Finley v. Marathon Oil Co., 75 F.3d 1225, 1230 (7th Cir. 1996). And while the Court has discretion in how it applies the exclusionary rule, that discretion is not unlimited. Where, as here, the party seeking exclusion does not support its claims of "harm," exclusion is prohibited. Sherrod v. Lingle, 223 F.3d 605, 612-13 (7th Cir. 2000):

> In this instance, Sherrod disclosed the names of both retained experts and their initial reports well before the deadline, thus preventing the chance that unfair surprise would hamper the defendants' preparation of the case.... [I]n this instance we can see no harm that came from Sherrod's failure to meet the December 30 deadline. Because Rule 37 does not require sanctions against a non-disclosing party if that party's violation was harmless, the district court abused its discretion by excluding Sherrod's experts *without any indication that the defendants had been harmed* by his discovery violation.

Id. at 613 (emphasis added). Here, not only did Glenayre bring about the necessity for Dr. Silva's declaration testimony by untimely revealing Bettis's expert opinions. Glenayre also makes no allegation of harm. Pages 6-7 of Glenayre's brief purportedly addresses "harm," but is completely devoid of any discussion of "harm." See Fed. R. Civ. P. 37(c)(1); Edward Lowe Industries, Inc. v. Oil-Dri Corp. of Am., 1995 U.S. Dist. LEXIS 17127 at *6-*7 (N.D. Ill. Nov. 15, 1995) (denying motion to strike Rule 26 report for lack of showing of harm to movant).

Moreover, Glenayre's cases do not support its position. None of Glenayre's cases involve an expert who responded to new expert testimony (like Bettis's) that the opponent should have disclosed earlier but did not. All of Glenayre's cases are distinguishable for other reasons as well.

In <u>NutraSweet Co.</u> v. <u>X-L Engineering Co.</u>, 227 F.3d 776, 786 (7th Cir. 2000), the Seventh Circuit affirmed the district court's partial limitation on an expert's trial testimony because of expert's "failure to file some sort of a supplemental report." <u>Id.</u> Thus, unlike here, the expert had provided too little information before trial. To show how inapplicable <u>Nutrasweet</u> is, Glenayre here complains Dr. Silva provided *too much* information before trial.

In <u>Finley</u> v. <u>Marathon Oil Co.</u>, 75 F.3d 1225, 1230-31 (7th Cir. 1996), the Seventh Circuit explained that the district court's "broad discretion" gave it the right to exclude charts to be used by the plaintiff's rebuttal expert at trial. Glenayre's brief totally ignores the reasoning in <u>Finley</u>. Such charts included newly "massaged" data disclosed "months" after the deadline for rebuttal reports. <u>Id.</u> at 1231. Here, in sharp contrast, Dr. Silva will not present any newly "massaged" data; he will simply testify about the '900 patent and the MVP consistent with his report. Moreover, all of the supposedly "new" information was disclosed within 30 days of Bettis's February 2003 expert declaration.

In <u>Paris</u> v. <u>AMOCO Oil Co.</u>, 2002 U.S. Dist. LEXIS 2950 (N.D. Ill. Feb. 15, 2002), Magistrate Judge Brown excluded an expert's rebuttal testimony after the pertinent party missed numerous court ordered rebuttal report deadlines, including several extensions of time. See <u>id.</u> at *8 ("repeated extensions of time"). Here, no court ordered deadlines apply at all.

In <u>Central States, Southeast & Southwest Areas Pension Fund</u> v. <u>XTL Tranp.</u>, 1996 U.S. Dist. LEXIS 10880 (N.D. Ill. July 26, 1996), Judge Conlon excluded an expert who was first

13

disclosed on July 10 for an August 12 trial -- in other words, an expert whose *identity* was disclosed only 33 days before trial. Id. at *7. The excluded expert also failed to comply with any of the provisions of Rule 26(a)(2) -- he did not submit a report at all. Id. at *12 ("Silcoff has still not provided an expert report with supporting information."). Central States does not support Glenayre.

Finally, in Fuller v. Volvo GM Heavy Truck Corp., 1995 U.S. Dist. LEXIS 11638 (N.D. Ill. 1995), Judge Nordberg had *denied* an earlier motion to bar an expert's opinions that was based on a timeliness objection. Id. at *2 ("The Court allowed Plaintiff's expert to supplement his opinion primarily because no prejudice to Rand was apparent."). Judge Nordberg granted a subsequent motion to bar a new expert only when the offending party tried to designate a *different* expert to circumvent the original final deadline for the first expert. And even then, the party was given leave to move to consider allowing the new expert if circumstances changed. Id. at *9. Thus, Fuller does not support Glenayre, since it shows that untimeliness alone will not justify barring an expert.

                                              Respectfully submitted,

                                              */s/ Raymond P. Niro*
                                              Raymond P. Niro
                                              Robert P. Greenspoon
                                              William W. Flachsbart
                                              NIRO, SCAVONE, HALLER & NIRO
                                              181 West Madison Street, Suite 4600
                                              Chicago, Illinois 60602
                                              (312) 236-0733

                                              Attorneys for Philip Jackson

See Case File for Exhibits