UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*FILED*

APR 3 0 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| GLENAYRE ELECTRONICS, INC.,<br>a Colorado corporation, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 02 C 0256 |
| | ) | |
| v. | ) | Honorable Harry D. Leinenweber |
| | ) | Magistrate-Judge Ian H. Levin |
| PHILIP JACKSON, an individual, | ) | |
| | ) | |
| Defendant. | ) | |
| PHILIP JACKSON, an individual, and<br>PMJ FAMILY LIMITED PARTNERSHIP, | )<br>) | |
| | ) | |
| Counterclaim-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GLENAYRE ELECTRONICS, INC. and<br>PRIMECO PERSONAL<br>COMMUNICATIONS, L.P. | )<br>)<br>) | |
| | ) | |
| Counterclaim-Defendants. | ) | |

DOCKETED

MAY 0 2 2003

## NOTICE OF FILING

PLEASE TAKE NOTICE that on April 30, 2003, we caused to be filed in the United States Court for the Northern District of Illinois, Eastern Division, **PHIL JACKSON'S OPPOSITION TO GLENAYRE'S RENEWED MOTION JMOL OR FOR A NEW TRIAL**, a copy of which is attached hereto and herewith served upon you. Phil Jackson's brief responds to Glenayre's over-length 25-page "Renewed Motion," which raised numerous fact, intensive issues relating to the trial; accordingly, Phil Jackson's brief also exceeds 15 pages.

Respectfully submitted,

Raymond P. Niro
Robert P. Greenspoon
William W. Flachsbart
NIRO, SCAVONE, HALLER & NIRO
181 West Madison Street, Suite 4600
Chicago, Illinois 60602
(312) 236-0733

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GLENAYRE ELECTRONICS, INC.,<br>a Colorado corporation,<br><br>Plaintiff,<br><br>v.<br><br>PHILIP JACKSON, an individual,<br><br>Defendant.<br>PHILIP JACKSON, an individual, and<br>PMJ FAMILY LIMITED PARTNERSHIP,<br><br>Counterclaim-Plaintiffs,<br><br>v.<br><br>GLENAYRE ELECTRONICS, INC.,<br><br>Counterclaim-Defendant. | Civil Action No. 02 C 0256<br><br>Honorable Harry D. Leinenweber<br>Magistrate-Judge Ian H. Levin |

**FILED**

APR 8 0 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**DOCKETED**

MAY 0 2 2003

**PHIL JACKSON'S OPPOSITION TO GLENAYRE'S
RENEWED MOTION JMOL OR FOR A NEW TRIAL**

Raymond P. Niro
Robert P. Greenspoon
William W. Flachsbart
NIRO, SCAVONE, HALLER & NIRO
181 West Madison Street, Suite 4600
Chicago, Illinois 60602
(312) 236-0733

Attorneys for Philip Jackson and PMJ Family
Limited Partnership

157

# TABLE OF CONTENTS

Page

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   GLENAYRE WAIVED ALL BUT ONE OF THE
      ARGUMENTS IT IS NOW TRYING TO PRESENT . . . . . . . . . . . . . . . . 3

      A.    Only JMOL Motions Made At The Close Of All The
            Evidence Can Be Renewed After Entry Of Judgment . . . . . . . . . . . . . . . 3

      B.    Rule 50(a) Motions JMOL Must Be Specific . . . . . . . . . . . . . . . . 4

      C.    Glenayre's Motion JMOL At The Close Of All Evidence Was Limited
            Strictly To The Issue Of "Gate Means Coupled With Said Detecting Means" . 5

III.  THE JURY'S DAMAGES VERDICT SHOULD NOT BE SET ASIDE . . . . . . . . . 6

      A.    Glenayre Elected For Tactical Reasons
            Not To Present Any Damages Evidence Or Argument . . . . . . . . . . . . . . 6

      B.    The Jury Was Guided By The Court's Damages Instructions . . . . . . . . . . 9

      C.    Substantial Evidence Existed On The Royalty Factors . . . . . . . . . . . . . 10

      D.    The Jury Could Calculate A Reasonable
            Royalty Considering Glenayre's Actual Sales
            And Profits And The Royalty Rates That Mr. Jackson
            Previously Charged Or That Glenayre Previously Accepted. . . . . . . . . . . 16

      E.    Because Voice Mail Equipment Was Involved,
            The Jury Also Could Calculate A Reasonable
            Royalty Based Upon The Revenues Realized
            By Glenayre's Fully Indemnified Customers . . . . . . . . . . . . . . . . . . 20

      F.    The Jury's Damage Award Left Glenayre With A Generous Profit Margin . 22

      G.    Glenayre's New Lump-Sum Royalty Calculation (Not
            Presented To The Jury) Ignores Its Own Royalty Payments . . . . . . . . . . 23

IV.   GLENAYRE IS NOT ENTITLED TO A REMITTITUR OF DAMAGES . . . . . . 26

V.      SUBSTANTIAL EVIDENCE ALSO SUPPORTS
        THE JURY'S FINDING OF INFRINGEMENT . . . . . . . . . . . . . . . . . . . . 27

        A.      Literal Infringement Is A Question Of Fact . . . . . . . . . . . . . . . . . . 28

        B.      There Is Substantial Evidence Of Literal
                Infringement Of Each "Means Plus Function" Clause . . . . . . . . . . . . . 28

        C.      Glenayre Itself Urged The Jury To Decide
                The Case On The Basis Of The Experts' Credibility . . . . . . . . . . . . . . . 30

        D.      Glenayre's Own Emphasis On Expert Testimony About
                Infringement Was Consistent With Federal Circuit Precedent,
                Which Permits Experts To Testify To Their Conclusions About Means
                Plus Function Claims Without Even Discussing Underlying Facts Or Data  . 32

        E.      There Was Substantial Evidence The MVP
                Had A Gate Means Coupled To A Detecting Means . . . . . . . . . . . . . . . 35

        F.      There Was Substantial Evidence The MVP Had A "Control Means" . . . . . 38

        G.      There Was Substantial Evidence Glenayre's
                MVP Had An "Access Limiting Circuit Means" . . . . . . . . . . . . . . . . . 40

        H.      There Was Substantial Evidence The MVP Had A Counter Means . . . . . . 44

        I.      Glenayre's Two Cases Do Not Support Its Position . . . . . . . . . . . . . . . 46

VI.     GLENAYRE'S REQUEST FOR A NEW TRIAL SHOULD BE DENIED . . . . . . 47

VII.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# TABLE OF AUTHORITIES

Page(s)

## Federal Cases

*ALM Surgical Equipment Inc.* v. *Kirschner Medical Corp.*,
15 U.S.P.Q. 2d 1241 (D.S.C. 1990) ........................................................ 22, 26

*Abernathy* v. *Superior Hardwoods, Inc.*,
704 F.2d 963 (7th Cir. 1983) ................................................................. 26

*Al-Site Corp.* v. *VSI International Inc.*,
174 F.3d 1308 (Fed. Cir. 1999) ............................................................. 1

*Alco Standard Corp.* v. *Tennessee Valley Authority*,
808 F.2d 1490 (Fed. Cir. 1986) ............................................................. 36

*Alpex Computer Corp.* v. *Nintendo Co.*,
102 F.3d 1214 (Fed. Cir. 1996) ............................................................. 46

*Altech Controls Corp.* v. *E.I.L. Instruments, Inc.*,
71 F. Supp. 2d 677 (S.D. Tx. 1999) ........................................................ 46, 47

*Applied Medical Resources Corp.* v. *United States Surgical Corp.*,
147 F.3d 1374 (Fed. Cir. 1998) ............................................................. 1

*Aqua-Aerobic Systems, Inc.* v. *Richards of Rockford, Inc.*,
1987 WL. 4672 (Fed. Cir. 1987)............................................................. 8

*Arthur A. Collins, Inc.* v. *Northern Telecom Limited*,
216 F.3d 1042 (Fed. Cir. 2000) ............................................................. 34, 42, 46

*B&H Manufacturing, Inc.* v. *Foster-Forbes Glass Co.*,
1993 U.S. Dist. LEXIS 21432, 26 U.S.P.Q. 2d 1066 (N.D. Ind. 1993) ...................... 19

*Bandag, Inc.* v. *Gerrard Tire Co.*,
704 F.2d 1578 (Fed. Cir. 1983) ............................................................. 20

*Bio-Rad Laboratories, Inc.* v. *Nicolet Instrument Corp.*,
739 F.2d 604 (Fed. Cir. 1984) ............................................................... 19

*Calusinski* v. *Kruger*,
24 F.3d 931 (7th Cir. 1994) ................................................................. 47, 48

iii

*Carroll Touch, Inc.* v. *Electro Mechanical Systems, Inc.*,
15 F.3d 1573 (Fed. Cir. 1993) .................................................................. 289

*Catalina Lighting, Inc.* v. *Lamps Plus, Inc.*,
295 F.3d 1277 (Fed. Cir. 2002) ................................................................ 21

*Caterpillar Inc.* v. *Deere & Co.*,
224 F.3d 1374 (Fed. Cir. 2000) ................................................................ 38

*Comark Communications, Inc.* v. *Harris Corp.*,
156 F.3d 1182 (Fed. Cir. 1998) ............................................................ 2, 32

*DMI, Inc.* v. *Deere & Co.*,
802 F.2d 421 (Fed. Cir. 1986) .................................................................. 7

*Dana Corp.* v. *IPC Ltd.*,
860 F.2d 415 (Fed. Cir. 1988) ................................................................ 10

*Data Line Corp.* v. *Micro Technologies, Inc.*,
813 F.2d 1196 (Fed. Cir. 1987) .............................................................. 479

*Dragan* v. *L.D. Caulk Co.*,
12 U.S.P.Q. 2d 1081 (D. Del. 1989) ........................................................ 10

*Duro-Last, Inc.* v. *Custom Seal, Inc.*,
321 F.3d 1098 (Fed. Cir. 2003) ........................................................ 4, 5, 38

*Engineering Resources, Inc.* v. *CRS Steam, Inc.*,
1997 U.S. Dist. LEXIS 6101 (N.D. Ill. 1997),
aff'd mem., 1998 U.S. App. LEXIS 8486 (7th Cir. 1998)................................. 47

*GNB Battery Technologies, Inc.* v. *Exide Corp.*,
886 F. Supp. 420 (D. Del. 1995), aff'd mem.,
78 F.3d 605 (Fed. Cir. 1996) ................................................................ 22

*Gasser Chair Co.* v. *Infanti Chair Manufacturing Co.*,
943 F. Supp. 201 (E.D.N.Y, 1996), aff'd mem.,
47 USPQ.2d 1208 (Fed. Cir. 1998)........................................................... 26

*General Electro Music Corp.* v. *Samick Music Corp.*,
19 F.3d 1405 (Fed. Cir. 1994) ................................................................. 1

*Hanson* v. *Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed. Cir. 1983) .............................................................. 19

iv

*Hartness International Inc.* v. *Simplimatic Engineering Co.*,
819 F.2d 1100 (Fed. Cir. 1987) ................................................................. 25

*Hilgraeve Corp.* v. *Symantec Corp.*,
265 F.3d 1336 (Fed. Cir. 2001) ................................................................. 28

*IPPV Enterprises* v. *Echostar Communications Corp.*,
191 F. Supp. 2d 530 (D. Del. 2002)........................................................... 26

*In re Lone Star Industries, Inc. Concrete R.R. Cross Ties Litigation*,
882 F. Supp. 482 (D. Md. 1995)................................................................. 21

*Interactive Pictures Corp.* v. *Infinite Pictures, Inc.*,
274 F.3d 1371 (Fed. Cir. 2001) .................................................. 16, 35, 36, 42

*Johns-Manville Corp.* v. *Guardian Industrial Corp.*,
718 F. Supp. 1310 (E.D. Mich. 1989) ....................................................... 19

*Kasper* v. *St. Mary of Nazareth Hospital*,
135 F.3d 1170 (7th Cir. 1998) ..................................................................... 7

*Keisling* v. *SER-Jobs For Progress, Inc.*,
19 F.3d 755 (1st Cir. 1994) ......................................................................... 4

*LNP Engineering Plastics* v. *Miller Waste Mills, Inc.*,
2000 U.S. Dist. LEXIS 20888 (D. Del. 2000), aff'd,
275 F.3d 1347 (Fed. Cir. 2001) ................................................................. 22

*Lambert* v. *Genesee Hospital*,
10 F.3d 46 (2d Cir. 1993) ............................................................................. 4

*Lucent Technologies, Inc.* v. *Newbridge Networks Corp.*,
168 F. Supp. 2d 181 (D. Del. 2001).............................................. 2, 33, 34, 46

*Mahurkar* v. *C.R. Bard*,
79 F.3d 1572 (Fed. Cir. 1996) ................................................................... 25

*Mangren R&D Corp.* v. *National Chemical Co.*,
1995 U.S. Dist. LEXIS 871 (N.D. Ill. 1995), aff'd,
87 F.3d 937, 941 (7th Cir. 1996) ............................................................... 48

*Matter of Innovative Const. Systems, Inc.*,
793 F.2d 875 (7th Cir. 1986) ..................................................................... 26

*McCann* v. *Texas City Refining, Inc.*,
984 F.2d 667 (5th Cir. 1993) .......................................................... 4

*Mid-America Tablewares, Inc.* v. *Mogi Trading Co.*,
100 F.3d 1353 (7th Cir. 1996) ........................................................ 3

*Midwest Precision Services, Inc.* v. *PTM Industrial Corp.*,
887 F.2d 1128 (1st Cir. 1989) ........................................................ 21

*Minnesota Mining & Manufacturing Co.* v. *Johnson & Johnson Orthopaedics, Inc.*,
976 F.2d 1559 (Fed. Cir. 1992) ...................................................... 20

*Mobil Oil Corp.* v. *Amoco Chemicals Corp.*,
915 F. Supp. 1333 (D. Del. 1995) .................................................... 10

*Modine Manufacturing Co.* v. *Allen Group, Inc.*,
14 U.S.P.Q. 2d 1210 (N.D. Cal. 1989) ......................................... 26, 27

*New Idea Farm Equipment Corp.* v. *Sperry Corp.*,
916 F.2d 1561 (Fed. Cir. 1990) ...................................................... 2

*Odetics, Inc.* v. *Storage Technology Corp.*,
185 F.3d 1259 (Fed. Cir. 1999) ...................................................... 38

*Overhead Door Corp.* v. *Chamberlain Group, Inc.*,
194 F.3d *1261, 52* U.S.P.Q. 2d *(BNA) 1321 (Fed. Cir. 1999)* ............... 35, 36

*Panduit Corp.* v. *Stahlin Brothers Fibre Works, Inc.*,
575 F.2d 1152 (6th Cir. 1978) ..................................................... 24, 25

*Pennzoil Co.* v. *Texaco, Inc.*,
481 U.S. 1 (1987) .................................................................... 7, 8

*Pentech International, Inc.* v. *Hayduchok*,
931 F. Supp. 1167 (S.D.N.Y. 1996) ................................................. 25

*Perkin Elmer Corp.* v. *Computervision Corp.*,
732 F.2d 888 (Fed. Cir. 1984) ....................................................... 36

*Pincus* v. *Pabst Brewing Co.*,
893 F.2d 1544 (7th Cir. 1990) ....................................................... 26

*Powers* v. *Bayliner Marine Corp.*,
83 F.3d 789 (6th Cir. 1996) ......................................................... 21

vi

*Promega Corp.* v. *Lifecodes Corp.*,
1999 U.S. Dist. LEXIS 21094 (D. Ut. 1999) ........................................ 25

*Radio Steel & Manufacturing Co.* v. *MTD Products, Inc.*,
788 F.2d 1554 (Fed. Cir. 1986) ........................................ 21, 25

*Rohm & Haas Co.* v. *Brotech Corp.*,
127 F.3d 1089 (Fed. Cir. 1997) ........................................ 34

*Sartor* v. *Arkansas Natural Gas Corp.*,
321 U.S. 620 (1944) ........................................ 34

*Schneider (Europe) AG* v. *Scimed Life Systems, Inc.*,
852 F. Supp. 813 (D. Minn. 1994) ........................................ 16

*Smithkline Diagnostics, Inc.* v. *Helena Laboratories Corp.*,
926 F.2d 1161 (Fed. Cir. 1991) ........................................ 21, 24, 26

*Snellman* v. *Ricoh Co.*,
862 F.2d 283 (Fed. Cir. 1988) ........................................ 25

*State Industries, Inc.* v. *Mor-Flo Industries, Inc.*,
883 F.2d 1573 (Fed. Cir. 1989) ........................................ 24

*Stickle* v. *Heublein, Inc.*,
716 F.2d 1550 (Fed. Cir. 1983) ........................................ 25

*Studiengesellschaft Kohle m.b.H.* v. *Dart Industries, Inc.*,
666 F. Supp. 674 (D. Del. 1987), aff'd, 862 F.2d 1564 (Fed. Cir. 1988) ........................................ 10

*Sun Studs, Inc.* v. *ATA Equipment Leasing*,
872 F.2d 978 (Fed. Cir. 1989) ........................................ 16

*Symbol Technologies, Inc.* v. *Opticon, Inc.*,
935 F.2d 1569 (Fed. Cir. 1991) ........................................ 2, 28, 33, 34, 39, 42, 46

*TWM Manufacturing* v. *Dura Corp.*,
789 F.2d 895 (Fed. Cir. 1986) ........................................ 25

*Tec Air, Inc.* v. *Denso Manufacturing Michigan Inc.*,
192 F.3d 1353 (Fed. Cir. 1999) ........................................ 28

*Tennant* v. *Peoria & Perkin Union Railroad Co.*,
321 U.S. 29 (1944) ........................................ 1

*Total Containment, Inc.* v. *Environ Products, Inc.*,
921 F. Supp. 1355 (E.D. Pa. 1995), vacated on other grounds,
106 F.3d 427 (Fed. Cir. 1997) ........................................................................... 8

*Trans-World Manufacturing Corp.* v. *Al Nyman & Sons, Inc.*,
750 F.2d 1552 (Fed. Cir. 1984) ........................................................... 16, 22

*Transclean Corp.* v. *Bridgewood Services Inc.*,
2001 U.S. Dist. LEXIS 24383 (D. Minn. 2001), aff'd,
290 F.3d 1364 (Fed. Cir. 2002) ......................................................................... 24

*Trell* v. *Marlee Electronics Corp.*,
912 F.2d 1443 (Fed. Cir. 1990) ......................................................................... 16

*Union Carbide Chemicals & Plastics Technology Corp.* v. *Shell Oil Co.*,
308 F.3d 1167 (Fed. Cir. 2002) ........................................................................... 3

*Unisplay S.A.* v. *American Electronic Sign Co.*,
69 F.3d 512 (Fed. Cir. 1995) ....................................................................... 21, 24

*United States EEOC.* v. *AIC Security Investigations Ltd.*,
55 F.3d 1276 (7th Cir. 1995) .............................................................................. 3

*United States* v. *Nobles*,
69 F.3d 172 (7th Cir. 1995) ............................................................................... 9

*United States* v. *Reynolds*,
189 F.3d 521 (7th Cir. 1999) ............................................................................. 9

*Weinar* v. *Rollform, Inc.*,
744 F.2d 797 (Fed. Cir. 1984) ........................................................................... 1

*Zelinski* v. *Brunswick Corp.*,
185 F.3d 1311 (Fed. Cir. 1999) ........................................................................ 43

*Ziggity Systems, Inc.* v. *Val Watering Systems*,
769 F. Supp. 752 (E.D. Pa. 1990) ..................................................................... 8

## State Cases

*Texaco, Inc.* v. *Pennzoil Co.*, 729 S.W.2d 768, 860-62
(Tex. App. Houston 1st Dist. 1987), *reversed and
remanded on other grounds*, Pennzoil Co. v. Texaco, Inc., 481 U.S. 1 (1987) ............... 7

## **Federal Authorities**

35 U.S.C. § 112, ¶ 6.............................................................. 28, 32, 35

35 U.S.C. § 284 ................................................................... 24

Fed.R.Civ.P. 50(a)(1).......................................................... 1, 3, 35

Fed.R.Civ.P. 59 .................................................................. 47

Fed.R.Evid. 705 ................................................................. 33

## **Miscellaneous**

Federal Circuit Bar Journal, Vol. 7, No. 4 ....................................... 25

Wright, Miller & Kane, 11 Federal Practice and Procedure §2806 .......................... 1, 47

## I.    **INTRODUCTION**

"A decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." Wright, Miller & Kane, 11 <u>Federal Practice and Procedure</u> §2806, at p. 74 (1995) (collecting cases). A motion JMOL can be granted only when "a party has been fully heard on an issue and there is *no* legally sufficient evidentiary basis for a reasonable jury to find for that [prevailing] party on that issue ..." Fed.R.Civ.P. 50(a)(1) (emphasis added).

> Thus, on appeal we must consider the evidence of record in the light most favorable to [the prevailing plaintiff], drawing all reasonable inferences in its favor, without disturbing the jury's credibility determinations or substituting our resolutions of conflicting evidence for those of the jury.

<u>Applied Medical Resources Corp.</u> v. <u>United States Surgical Corp.</u>, 147 F.3d 1374, 1376-77 (Fed. Cir. 1998) (citations omitted); <u>Tennant</u> v. <u>Peoria & Perkin Union Railroad Co.</u>, 321 U.S. 29, 35 (1944) ("[the jury] weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable ... that conclusion ... cannot be ignored.")

Both sides agree credibility was at the heart of this case and credibility determinations are the exclusive province of the jury. <u>General Electro Music Corp.</u> v. <u>Samick Music Corp.</u>, 19 F.3d 1405, 1411 (Fed. Cir. 1994); <u>Al-Site Corp.</u> v. <u>VSI International Inc.</u>, 174 F.3d 1308, 1317 (Fed. Cir. 1999). Because jury awards of damages are so fact-dependent, they are not easily overturned or modified. <u>Weinar</u> v. <u>Rollform, Inc.</u>, 744 F.2d 797, 808 (Fed. Cir. 1984).

Having lost on every issue at trial, Glenayre now ignores the credibility determinations it

1

argued were the key to the case ("Credibility is key in this case. That's what this case is all about." Tr. 715). Glenayre even asks this Court to impose a heightened standard of "particularized evidence" that the Federal Circuit and district courts have explicitly rejected in connection with "means plus function" claim limitations. See Symbol Technologies, Inc. v. Opticon, Inc., 935 F.2d 1569, 1575 (Fed. Cir. 1991), and Lucent Technologies, Inc. v. Newbridge Networks Corp., 168 F. Supp. 2d 181, 211-12 (D. Del. 2001), discussed in Section V-D, below.

Glenayre also picks and chooses testimony and documents that it believes are favorable to its position -- ignoring that which is not. But that approach, is simply wrong as a matter of law:

> [Glenayre] misapprehends the role of the district court in deciding a motion for JMOL. A district court is not required to evaluate the evidence to determine whether the jury could have found otherwise. The district court is also not required to assume that the jury believed all or indeed any of [Glenayre's] exculpatory evidence in evaluating whether there was sufficient evidence to support the jury's finding. Simply because evidence is offered at trial does not mean that the court must assume the jury believed the evidence or gave it the same weight as does the profferor of such evidence.

Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1192 (Fed. Cir. 1998).

Even worse, Glenayre's damage argument rests entirely upon a theory it never presented at trial: that no more than $450,000 in damages could have been awarded (Br. 7-9). The desperation revealed by this utterly improper argument demonstrates, perhaps better than anything else that can be said, how untenable Glenayre's position is on the merits.

Glenayre's alternative requests for new trials are also unfounded. New trials are proper only where the jury reached its verdict as a result of passion or prejudice or if the verdict is against the clear weight of the evidence. New Idea Farm Equipment Corp. v. Sperry Corp., 916 F.2d 1561, 1565 (Fed. Cir. 1990). There is nothing in the record that suggests passion or

2

prejudice or that the verdict was against the clear weight of the evidence. Rather, what the record -- including the jury's careful study of trial transcripts and definitions of key words -- suggests is that the jury didn't believe Glenayre's witnesses or appreciate Glenayre's tactics of attacking Dr. Silva as a liar and saying absolutely nothing about damages. As shown in Section VI, below, that is not enough.

## II. GLENAYRE WAIVED ALL BUT ONE OF THE ARGUMENTS IT IS NOW TRYING TO PRESENT

### A. Only JMOL Motions Made At The Close Of All The Evidence Can Be Renewed After Entry Of Judgment

Although JMOL motions may be made "at any time before submission of the case to the jury," Fed.R.Civ.P. 50(a)(2), only arguments that have been properly presented *at the close of all evidence* under Fed.R.Civ.P. 50(a) can then be renewed under Rule 50 after entry of judgment. Indeed, the Seventh Circuit has squarely rejected the argument that Rule 50(a) motions JMOL made before the close of all the evidence are sufficient to preserve issues for a post-trial Rule 50(b) motion and a subsequent appeal.

> AIC and Vrdolyak concede that although after the verdict they filed a motion for judgment as a matter of law under Rule 50(b), arguing that there was insufficient evidence to support any award of punitive damages, *they had not earlier moved for judgment as a matter of law at the close of the evidence* pursuant to Rule 50(a) (what used to be called a motion for a directed verdict). That failure kills their argument.

United States EEOC. v. AIC Security Investigations Ltd., 55 F.3d 1276, 1286 (7th Cir. 1995) (emphasis added); Mid-America Tablewares, Inc. v. Mogi Trading Co., 100 F.3d 1353, 1364 (7th Cir. 1996) (holding that the district court erred in considering a post-verdict motion JMOL where no adequate motion had been made at the close of all the evidence). (Regional circuit decisions are controlling on procedural issues such as this one. See Union Carbide Chems. &

3

Plastics Tech. Corp. v. Shell Oil Co., 308 F.3d 1167, 1185 (Fed. Cir. 2002).)  In any event, other circuits agree. See, e.g., McCann v. Texas City Refining, Inc., 984 F.2d 667, 671 (5th Cir. 1993) (same as EEOC); Keisling v. SER-Jobs For Progress, Inc., 19 F.3d 755, 758-59 (1st Cir. 1994) (" Defendants ... made a motion for judgment as a matter of law at the close of Keisling's case.  That motion, however, was insufficient to preserve the issue that defendants are now seeking to present on appeal.  ...  Requiring the motion to be made *at the close of all the evidence* gives the opposing party an opportunity to respond to any evidentiary deficiencies noted by the motion by seeking to reopen the evidence prior to submission of the case to the jury.  See Fed.R.Civ.P. 50(a) advisory committee's note (1991).") (emphasis added).

**B.**    **Rule 50(a) Motions JMOL Must Be Specific**

Recently, in Duro-Last, Inc. v. Custom Seal, Inc., 321 F.3d 1098 (Fed. Cir. 2003), the Federal Circuit explicitly rejected a more-permissive view of what constitutes a sufficient predicate for a post-verdict Rule 50(b) motion concerning patent-related evidentiary issues:

> The requirement for specificity is not simply the rule-drafter's choice of phrasing. *In view of a litigant's Seventh Amendment rights, it would be constitutionally impermissible for the district court to re-examine the jury's verdict and to enter JMOL on grounds not raised in the pre-verdict JMOL.*

Id. at 1107 (emphasis added); see also, Lambert v. Genesee Hospital, 10 F.3d 46, 54 (2d Cir. 1993) (1991 amendments to Rule 50(a)(2) mandated specificity as to both law and facts).  For issues relating to substantive patent law -- infringement and "reasonable royalty" damages, at least -- pre-verdict motions JMOL under Rule 50(a) are governed by Federal Circuit law, not that of the regional circuits.  Lambert at 1106.  Such motions *must* be clear and specific, id., as well as made at the right time, which is at the close of *all* the evidence.

4

**C.    Glenayre's Motion JMOL At The Close Of All Evidence Was Limited
Strictly To The Issue Of "Gate Means Coupled With Said Detecting Means"**

Glenayre's *only* motion JMOL at the close of all the evidence was directed to the sufficiency of evidence relating to "gate means" and whether there was adequate evidence such means were "coupled with the detecting means" (Tr. 615-19). Specifically, Glenayre said:

> MR. MANN: Your Honor, we have a motion of our own for judgment as a matter of law. Your Honor, this goes to the gating [sic] means. And I trust that this (indicating) is visible to your Honor up here, if I've got that highlighted. It says, "The gate means is coupled with said detecting means and for normally preventing a response thereof to said tone means."

(Tr. 615). Glenayre went on to argue the "coupling" issue in detail (Tr. 615-19), quoting from Dr. Silva's trial testimony (Tr. 616) and complaining that "What Dr. Silva has failed to establish is any connection between the gate means and the detecting means, which is explicitly required by the claim: Gate means coupled with said detecting means" (Tr. 617). That was all that occurred at the end of all the evidence. Not one word about "control means" or "access limiting circuit means" or "counter means"; not one word about damages.

Thus, the *only* "sufficiency of the evidence" argument Glenayre preserved for its post-trial motion JMOL -- and for any subsequent appeal to the Federal Circuit -- was its "gate means coupled with the detecting means" argument. It has waived all other "sufficiency of the evidence" arguments, including damages and infringement generally. Duro-Last, 321 F.3d at 1108 ("In this case, Duro-Last waived its right to challenge any factual findings underlying the jury's obviousness verdict since its post-verdict JMOL motion was not supported by the required pre-verdict Rule 50(a) motion on obviousness. Accordingly, the jury findings are not subject to further testing, i.e., to determine whether they provide a legally sufficient evidentiary basis for a reasonable jury to find for the verdict winner.").

5

This is, in fact, the *fifth* different motion Glenayre has made for non-infringement as a matter of law for claims 5 and 79. The Court denied its two summary judgment motions which each presented different theories of "access limiting circuit means" non-equivalence. Then, the Court denied its JMOL motion at the close of Mr. Jackson's case which presented yet a different theory of non-equivalence under that claim element. The Court later denied Glenayre's JMOL motion at the close of all the evidence which urged the absence of "gate means/detecting means" coupling in the MVP. Since nothing has worked yet, Glenayre now offers newer different theories. These constantly shifting theories of alleged non-infringement actually reveal more than anything how void of merit they all really are.

## III.    THE JURY'S DAMAGES VERDICT SHOULD NOT BE SET ASIDE

### A.    Glenayre Elected For Tactical Reasons Not To Present Any Damages Evidence Or Argument

As the Court will recall, before the four-day break, Glenayre was given permission to modify its damages expert analysis and prepare and present new damages evidence if it wanted to do so:

> THE COURT: ... [Y]ou can call him [Glenayre's expert], and I'll let him depart from his expert opinion, modify it in light of the testimony that has been introduced and what has been excluded. But in order to be fair to Mr. Niro, depose him over the weekend about what the changes would be.

(Tr. 417). When the trial resumed four days later, Glenayre surprisingly announced it had no further witnesses (Tr. 611), in effect, acknowledging that it voluntarily decided to drop its own damage expert. Then, in closing, Glenayre offered the jury no damage theory at all (Tr. 717). Not a word about damages.

Most importantly, because Glenayre did not present to the jury the new calculations it is

trying out for the first time in its post-verdict renewed motion JMOL, that argument cannot be considered now:

> One who fails to tell his story convincingly to the jury may not correct that failure on appeal when his adversary has presented evidence on which a reasonable jury may reach the conclusion it did.

DMI, Inc. v. Deere & Co., 802 F.2d 421, 427 (Fed. Cir. 1986).

Thus, while Glenayre now claims Mr. Jackson asked for "too much," it also admits it offered no "plausible alternative" to what Mr. Jackson sought because it asked the jury to award nothing (Tr. 717). As Chief Judge Posner held in Kasper v. St. Mary of Nazareth Hospital, 135 F.3d 1170 (7th Cir. 1998), a defendant who makes such a tactical choice "has only itself to blame for having gambled and lost":

> So we have the unfortunately common case in which the plaintiff asks the jury for too much in the way of damages and the defendant, instead of offering a plausible alternative (here, for example, based on the difference between $30,000 and $43,000), goes for broke and asks the jury to award nothing, even though nothing is too low. ***When a jury is given such a choice and chooses the higher figure, the defendant has only itself to blame for having gambled and lost.***

Id. at 1178 (emphasis added, citations omitted). In the famous Texaco, Inc. v. Pennzoil Co. case, as a matter of trial strategy, Texaco elected to present no damage witness in response to Pennzoil's calculation of $10 billion in damages and lost. 729 S.W.2d 768, 860-62 (Tex. App. Houston 1st Dist. 1987), *reversed and remanded other grounds*, Pennzoil Co. v. Texaco, Inc., 481 U.S. 1 (1987). Texaco was ultimately forced into bankruptcy as a consequence of that decision and the resulting damage award. *Texaco to Mail Its Ballots*, N.Y. Times, Feb. 3, 1988 at D5. But having decided to forego any evidence of its own, Texaco could not later complaint that the $10 billion award was excessive:

Although the verdict is large and the trial court, in the exercise of its sound discretion, could have set it aside, an appellate court will not disturb the verdict in the absence of circumstances tending to show that it was the result of passion, prejudice, or other improper motive; or that the amount fixed was not the result of a deliberate and conscientious conviction in the minds of the jury and the court; or that the amount was so excessive as to shock a sense of justice of the appellate court.

\* \* \* \*

... Though we are mindful of the economic effect the judgment might have on some individuals and institutions, and we are sympathetic with those who might be affected by the verdict through no fault of their own, we are not authorized by law to substitute our judgment for that of the jury, and to make redress as we deem appropriate. Because we are of the opinion that the evidence supports the jury's award of compensatory damages, we do not consider a remittitur of those damages appropriate.

Id. at 864-65.

In this case, Glenayre's post-trial damages arguments were never presented to the jury, such as its suggestions now that it should only have to pay $450,000 (Br. 7-8) and that damages somehow depend upon the number of claims infringed (Br. 5). (The latter suggestion is wrong as a matter of law anyway. "The amount of damages is not affected by the number of claims infringed because the patent is infringed regardless of whether one, some, or all of its claims are infringed." Ziggity Systems, Inc. v. Val Watering Systems, 769 F. Supp. 752, 819 (E.D. Pa. 1990); see also, Total Containment, Inc. v. Environ Products, Inc., 921 F. Supp. 1355, 1394 (E.D. Pa. 1995) ("[T]he damages are the same whether there is infringement of one or one hundred claims. Damages are not multiplied by the number of claims infringed."), vacated on other grounds, 106 F.3d 427 (Fed. Cir. 1997); Aqua-Aerobic Systems, Inc. v. Richards of Rockford, Inc., 1987 WL 4672, *1 (Fed. Cir. 1987) (unpublished) ("the number of valid claims infringed here has no bearing on damages").)

8

**B.**     **The Jury Was Guided By The Court's Damages Instructions**

The Court's instructions told the jury exactly how to calculate damages, and Glenayre's

motion does not attack any of those instructions. The jury was told it was to decide the amount

of a reasonable royalty based upon a hypothetical negotiation:

> Mr. Jackson has the burden of proving his damages by a preponderance of
> the evidence. The patent law specifically provides that the amount of damages that
> Glenayre must pay Mr. Jackson for the infringing '900 patent is the reasonable
> royalty for the use that Glenayre made of the invention set forth in the '900 patent.

> * * * *

> A reasonable royalty is the royalty that would have resulted from a
> hypothetical negotiation between Mr. Jackson and a person or company in the
> position of Glenayre taking place at the time that the infringement began.

(Tr. 740-41). The jury was told that a lump-sum amount could be used based upon projected

royalties:

> A reasonable royalty may be calculated as a lump-sum, paid-up license
> based on the projected royalties as to the date the infringement began.

(Tr. 743). The jury was also told that actual profits and sales could be considered:

> Although the relevant date for the hypothetical reasonable royalty
> negotiation is the date that the alleged infringement began, you may consider in
> your determination of the reasonable royalty damages any actual profits by
> Glenayre after that time, and any commercial success of the patented invention in
> the form of sales of the patented or infringing products after that time.

(Tr. 742-43). Finally, the jury was told not to use guesswork or speculation:

> You must not base your verdict in any way upon sympathy, bias,
> guesswork or speculation. Your verdict must be based solely on the evidence and
> instructions of the Court.

(Tr. 743). It is presumed the jury followed each of those instructions. United States v. Nobles,

69 F.3d 172, 184 (7th Cir. 1995); United States v. Reynolds, 189 F.3d 521, 529 (7th Cir. 1999).

And there is certainly no factual basis to believe the jury ignored any instruction, much less all of them, or that it resorted to either guesswork or speculation.

### C.    <u>Substantial Evidence Existed On The Royalty Factors</u>

Substantial evidence is simply such relevant evidence from the record *taken as a whole* as might be accepted by a reasonable mind as adequate to support the verdict. <u>Dana Corp.</u> v. <u>IPC Ltd.</u>, 860 F.2d 415, 417 (Fed. Cir. 1988). Here, there is adequate evidence concerning all the relevant <u>Georgia-Pacific</u> factors, and, of course, not every <u>Georgia-Pacific</u> factor must even be considered in determining a "reasonable royalty," since "not every factor in the *Georgia-Pacific* list is relevant to every case." <u>Studiengesellschaft Kohle m.b.H.</u> v. <u>Dart Industries, Inc.</u>, 666 F.Supp. 674, 681 (D. Del. 1987), aff'd, 862 F.2d 1564 (Fed. Cir. 1988); <u>Dragan</u> v. <u>L.D. Caulk Co.</u>, 12 USPQ.2d 1081, 1089 (D. Del. 1989) ("No cases have relied on all fifteen of these factors. Therefore, to support an award of damages based on a reasonable royalty, a party must adduce evidence only with respect to the factors relevant in that case."); <u>Mobil Oil Corp.</u> v. <u>Amoco Chemicals Corp.</u>, 915 F.Supp. 1333, 1353 (D. Del. 1995) ("In performing a hypothetical negotiation analysis, it is important to recognize that some of the *Georgia-Pacific* factors may be of minimal or no relevance to a particular case and other factors may have to be molded by the Court to the facts of the case at hand.").

In an agreed instruction, this Court identified 12 separate factors to be considered in determining a reasonable royalty:

> In determining the value of a reasonable royalty, you may consider evidence concerning profits made from the use of the patented invention, as well as evidence on any of the following factors:

> One, any royalties received by Mr. Jackson for the licensing of the patent in suit, proving or tending to prove and establish royalty.

Two, the rates paid by Glenayre to license other patents comparable to the '900 patent.

Three, Mr. Jackson's established policy and marketing program to maintain his right to exclude others from using the patented invention, by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity.

Fourth, the commercial relationship between Mr. Jackson and Glenayre, such as whether or not they are competitors in the same territory in the same line of business.

Five, the text of selling the patented product and promoting sales of other products of Glenayre.

Six, the duration of the '900 patent.

Seven, the commercial success of the product, as represented by its sales, its profitability and its current popularity.

Eight, utility and advantages of the patented invention over the old modes or devices, if any, that have been used for achieving similar results.

Nine, the nature of the patented invention, the character of the commercial embodiment of it, as owned and produced by Mr. Jackson, and the benefits to those who have used the invention.

Ten, the extent to which Glenayre has made use of the invention and any evidence that shows the value of that use.

Eleven, the portion of the profit or of the selling price that may be customary in the particular business, or in comparable businesses, to allow for the use of the invention and analogous inventions.

Twelve, the portion of the profit that arises from the patented invention itself, as opposed to profit arising from features unrelated to the patented invention, such as the manufacturing process, business risks or design features or improvements added by the accused infringer.

(Tr. 741-42). There was trial evidence presented on nearly every one these factors -- for example:

**1.      Any royalties received by Mr. Jackson for the licensing of the patent in suit, proving or tending to prove an established royalty:**

11

- Phil Jackson testified that he granted licenses under his patent without the necessity of a lawsuit and outside the context of any settlement (Tr. 485-86; PX-62 A-F).

- Those licenses reflect lump-sum amounts that were based upon royalty percentages as follows -- Cobra Electronics (2.5%); Sanyo Electronics (2.8%); Unical-Northwestern Bell (5%); Swatch (2.5%); Samsung Electronics ($380,000 lump sum -- no percentage); Brother Industries (3%) (PX-62 A-F).

2. **The rates paid by Glenayre to license other patents comparable to the '900 patent:**

- Glenayre and its predecessor BBL Industries entered into licenses with a company called VMX in 1983 and 1984 (PX-63).

- The licensed VMX patent related directly to voice mail and required a royalty payment of $250,000 (BBL) or 30,000 company shares (Glenayre) plus 6% of Glenayre's MVP sales (Tr. 259, 482-84; PX-63). Since 1991, Glenayre shares have split six times (Exhibit A), making the up-front 30,000 shares really 1,920,000 share on today's market: $(30,000 \times 2^6)$.

5. **The effect of selling the patented product in promoting sales of other products of Glenayre:**

- Sales of MVPs has resulted in enormous service and software revenues (Tr. 254, 258 "...Our total revenue now consists of about 40 percent service.").

- According to Glenayre, the MVP was responsible for most of Glenayre's revenues (Tr. 231). Voice mail is the common denominator, the key building block for Glenayre's business (Tr. 243).

6. **The duration of the '900 patent:**

- Mr. Jackson's patent was issued on June 24, 1986 and will expire on June 24, 2003 (Tr. 107).

- The period for infringement as of the 1989 date for the hypothetical negotiations, therefore, is 14 years.

7. **The commercial success of the product as represented by its sales, its profitability and its current popularity:**

- Glenayre had MVP sales of $330 million and margins of $254 million just from 1996 to date (Tr. 272).

- Those sales and margins would be considerably higher if the further time period from 1989 to 1996 were considered (Tr. 273-74), at least in the range of $400 million in sales and $300 million in margin (Tr. 673, 675; DX-81).

- Glenayre uses the voice mail features of its MVP to promote and sell its equipment to customers (Tr. 241-43). Glenayre represents that voice mail "drives revenues," reduces "churn" because "voice mail users are more loyal" and "drives demand for future enhanced services" (DX-100).

- The payback period for a user of a Glenayre MVP is as short as 13 months; indeed, it could be five months (Tr. 242, DX-79, DX-80) and password security is the essential component of the success of the product (Tr. 241-45; DX-79, DX-80).

- Glenayre represented that "Voice Mail is the Most Popular and the Largest Revenue Generator" in its line of products (DX-100, p. 38).

13

8. **The utility and advantages of the patented invention over the old models or devices if any, that had been used for achieving similar results:**

- Glenayre admitted that use of password security (which is the essence of Mr. Jackson's invention) is essential to the success of its MVPs (Tr. 243).

9. **The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by Mr. Jackson and the benefits to those who have used the invention:**

- Glenayre promotes the benefits of its voice mail systems to end users as one of its key selling points (Tr. 241-42).

- Users can achieve a full payback of the system cost in 13 months or even as little as five months (Tr. 242, 244-45; DX-79, DX-80).

- Each system can earn as much as $3.3 million per year per 100,000 subscribers (Tr. 250-51; DX-100). Since Glenayre has 50 million subscribers for its MVP equipment (Tr. 240; DX-237), its MVP equipment base can earn more than $165 million per year or nearly $250 million for the 18 month damage period (Tr. 674, 677).

- The evidence showed Glenayre's voice mail systems reduced churn by promoting customer loyalty (Tr. 249-50; DX-100).

- Glenayre has a Powerpoint presentation (referred to at trial as a CD-ROM, Tr. 250) that explains the MVP's financial benefits as follows:

**Financial Benefits**
- Increased Revenue
  -- Monthly Fee for Service
  -- Airtime to Check Messages

14

             -- Airtime to Return Calls
             -- Incoming Call Completion

- Reduced Churn
             -- Voice Mail Users More Loyal

(DX-100 at p. 17).

- Glenayre fully indemnifies its customers (Tr. 479-81) which is a benefit to them, but a significant potential liability to Glenayre.

10.    **The extent to which Glenayre has made use of the invention and any evidence that shows the value of that use:**

- The MVP product line accounts for most of Glenayre's revenue (Tr. 231).

- Glenayre was able to build $108 million in cash (DX-236 at 31) and had margins in the 77% to 83% range (Tr. 238, 674, DX-81, DX-123) as a result of MVP sales.

- Voice mail is one of "the fundamental anchor capabilities" for product revenue (Tr. 243); it is what Glenayre's business is built on (Tr. 243; DX-79, DX-80).

- Glenayre admits the MVP product offers "enormous revenue potential" to end users (DX-79, DX-80).

- Password-protected security is essential for a voice messaging product like MVP (Tr. 243).

- In summary terms, Glenayre says this about the value of its MVP voice mail system:

> Voice messaging or VoiceMail is the foundation -- the cornerstone -- for efficient communications and productivity. It offers basic advantages to subscribers and facilitates completion of inbound and outbound mobile calls, thereby generating revenue for carriers.

15

(DX-80, GLEI000755). This evidence was all before the jury as an aid to calculating a reasonable royalty, and it was sufficient to support the jury's choice of a damage award under a number of different calculation methods.

### D. The Jury Could Calculate A Reasonable Royalty Considering Glenayre's Actual Sales And Profits And The Royalty Rates That Mr. Jackson Previously Charged Or That Glenayre Previously Accepted

In the absence of any sales projections as of the 1989 date for the hypothetical negotiation (Glenayre produced none), Glenayre's actual sales and profits certainly were open for consideration by the jury in determining a reasonable royalty. The entire infringement period from 1989 through 2003 had to be considered even though, by definition, negotiators at the time infringement began could not foresee the future. See, e.g., Interactive Pictures Corp. v. Infinite Pictures, Inc., 274 F.3d 1371, 1385 (Fed. Cir. 2001) ("*Lindemann* therefore supports the proposition that an actual infringer's profit margin can be relevant to the determination of a royalty rate in a hypothetical negotiation."); Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc., 750 F.2d 1552, 1568 (Fed. Cir. 1984) ("Evidence of the infringer's actual profits generally is admissible as probative of his anticipated profits."); Trell v. Marlee Electronics Corp., 912 F.2d 1443, 1446 (Fed. Cir. 1990) ("In determining the result of such a hypothetical negotiation, the district court may consider the infringer's anticipated profits, as indicated by evidence of actual profits."); Sun Studs, Inc. v. ATA Equip. Leasing, 872 F.2d 978, 994 (Fed. Cir. 1989) ("we have recognized that compensation for infringement can take cognizance of the actual commercial consequences of the infringement"). Schneider (Europe) AG v. Scimed Life Systems, Inc., 852 F.Supp. 813, 860 (D. Minn. 1994) ("Evidence of a reasonable royalty can be presented *in various ways, including*: a) defendant's anticipated profits, as indicated by actual profits made; b) expert

16

testimony regarding reasonableness under the circumstances; and c) the rate the patentee would have required to grant a license.") (emphasis added).

The jury was also entitled to consider that the Jackson licenses in evidence having single-digit royalty rates authorized the sale of answering machines, not voice mail equipment (Tr. 491-92). A critical distinction between answering machines and central office voice mail is that voice mail equipment permits the telephone company customer to earn a continuing revenue stream. Answering machines do not. The evidence showed such revenues result in complete payback for the MVP customer in 5 to 13 months (Tr. 241-45, DX-79, DX-80). Thus, the jury was entitled to believe a hypothetical license to sell a machine (such as the MVP) which allows customers to generate revenue is far more valuable than a license to sell an answering machine that just sits in a consumer's home. Royalty rates much higher than 6% were clearly justified. Likewise, there was no evidence the VMX-style voicemail circa 1984 was revenue-generating for central-office customers. According to the evidence, only the infringing MVP voicemail provided these valuable benefits. Thus, even the 6% VMX license was for a less valuable application.

Another factor the jury could consider to conclude a voicemail license is more valuable is that answering machines do not have to be operated remotely to be useful -- most people just press a button on the answering machine itself when at home to retrieve messages. The MVP relies far more on the Jackson invention -- users *must* retrieve their messages remotely *every time*.

What the evidence showed is that a major answering machine manufacturer, Brother, paid Mr. Jackson the sum of $450,000 "in lieu of a running royalty of 3%" for a license under the '900 patent (PX-62B). The Brother 3% royalty is right in the middle of the royalties Mr. Jackson was paid by his licensees: Sanyo paid a lump-sum of $282,500 based upon a 2.8% royalty estimate

17

(PX-62C); Unical paid $200,000 on a 5% royalty from "the date of this Agreement until 24 June 2003 (the date the '900 patent expires" (PX-62A); Cobra paid $150,000 based upon a 2.5% royalty rate (PX-62D); Swatch paid $6,125 on a 2.5% royalty (PX-62F); Samsung paid $380,000 lump-sum with no royalty estimate (PX-62E). Glenayre itself paid the equivalent of nearly two million shares of today's stock plus a 6% royalty to VMX based on "net sales of stand-alone voice mailbox systems" (PX-63). Each of these licenses was negotiated outside the context of any litigation in arms-length negotiations (Tr. 485-88).

"The commercial success of the product, as represented by its sales, its profitability and its current popularity" was one of the factors the jury was authorized by agreement of the parties to consider in calculating a reasonable royalty (Tr. 742). As shown in Subsection C, above, there was substantial evidence relating to that factor. Hence, the jury could well have considered Mr. Jackson's licenses, which required lump-sum payments between 2.5% and 5% of sales (PX-62 A-F) and, as instructed (Tr. 743), have calculated a lump-sum royalty based upon Glenayre's documented sales and profits between 1996 and 2001 (Tr. 270; DX-81), adding actual sales and profits for 2002 and 2003 (Tr. 272-73; DX-123) and estimated sales and profits from 1989 to 1996 (Tr. 273-75) -- a number in excess of $330 million in sales and $254 million in profits (Tr. 273) and likely in the range of $400 million in sales and $300 million in profit (Tr. 763-74).

Although Glenayre's main complaint is that the jury awarded more than the amounts contained in any licenses in evidence, that is only because the projected and actual volume of sales was small. Such licenses as a matter of law signify a floor, not a ceiling, for reasonable royalty damages. Courts routinely find that the presence of other <u>Georgia Pacific</u> factors will properly boost the "reasonable royalty" damages figure to a *multiple* of the highest royalty rate contained

18

within licenses in evidence. See Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp., 739 F.2d 604, 617 (Fed. Cir. 1984) (affirming reasonable royalty of "one third of the selling price" even though "the industry royalty rate runs from three to ten percent of sales," since even a settled royalty rate does not "necessarily establish the ceiling for the royalty that may be assessed after an infringement trial."); Hanson v. Alpine Valley Ski Area, Inc., 718 F. 2d 1075, 1078, 1081 (Fed. Cir. 1983) (affirming royalty "amount[ing] to 18 percent of the purchase price" even though the only license rate in evidence was 2.5%); Johns-Manville Corp. v. Guardian Indus. Corp., 718 F. Supp. 1310, 1315 (E.D. Mich. 1989) (finding 10% royalty appropriate "*for an infringer*" even though the licenses in evidence all disclosed a 5% running rate (emphasis in original)); cf. B&H Manufacturing, Inc. v. Foster-Forbes Glass Co., 1993 U.S. Dist. LEXIS 21432, at *18, 26 U.S.P.Q.2d 1066 (N.D. Ind. 1993) (finding license agreements "useful to the jury for the purpose of establishing a damages *floor*" (emphasis added)). Indeed, the figures in Bio-Rad, cited above, are strikingly similar to those here -- namely, a royalty of 33% of sales despite evidence of industry royalties only between 3% and 10%.

Clearly, the jury (that had as one of its members someone with a Bachelor of Science in economics who was working on an MBA, Tr. 30) had the ability (and, indeed, the obligation) to take a long look at Glenayre's success: enormous sales, documented profitability and the importance of the invention and then to calculate a reasonable royalty as the parties might have done so in 1989. Absolutely nothing suggests the jury did not properly apply the instructions of law to the facts of record.

**E.    Because Voice Mail Equipment Was Involved, The Jury Also Could Calculate A Reasonable Royalty Based Upon The Revenues Realized By Glenayre's Fully Indemnified Customers**

The jury was also entitled to look at the royalty calculation from the perspective of Glenayre's customers that Glenayre admitted it had "fully indemnified" (Tr. 479-81, DX-38, ¶5). Using a 1.5 year damage period from December 19, 2001 through June 24, 2003 and the financial forecasts contained in Glenayre's own documents, an end-user could anticipate yearly revenues of $3.3 million for a 100,000 subscriber base (DX-100). As Mr. Jackson argued to the jury in closing: Glenayre had a 50 million subscriber base (Tr. 240, DX-237) which means that Glenayre's indemnified customers earned approximately $250 million during the damage period (Tr. 677). Applying a 5% royalty paid by Unical yields a $12.5 million lump-sum payment, again well within the range of reasonableness argued to the jury: "So, you could take that times 6 percent, and that gets you about -- that's around 15 [million].  And if you do it at the low end [2.5%], it's $6.2 [million]" (Tr. 677).

All damage calculations -- and especially those based on the counterfactual "reasonable royalty" negotiation -- are approximations. See, e.g., <u>Bandag, Inc.</u> v. <u>Gerrard Tire Co.</u>, 704 F.2d 1578, 1582 (Fed. Cir. 1983) (testimony that the defendant used the patented process to recap "maybe half of [its tires], maybe three quarters of them" supported the conclusion that "a reasonable approximation of the amount of infringement is two-thirds of the time"); <u>Minnesota Mining & Mfg. Co.</u> v. <u>Johnson & Johnson Orthopaedics, Inc.</u>, 976 F.2d 1559, 1579 (Fed. Cir. 1992) ("Although damages may not be based on speculation, they need not be proved with unerring precision either.").

The calculation of the amount of damages is an issue of fact for the jury.  As the Federal

20

Circuit has held, the factual determination of a reasonable royalty, "need not be supported, and indeed, frequently is not supported by the specific figures advanced by either party." Smithkline Diagnostics, Inc. v. Helena Laboratories Corp., 926 F.2d 1161, 1167 (Fed. Cir. 1991). A jury need not select any specific royalty rate or damage methodology. "Rather, a jury's choice simply must be within the range encompassed by the record as a whole." Unisplay S.A. v. American Electronic Sign Co., 69 F.3d 512, 519 (Fed. Cir. 1995); Powers v. Bayliner Marine Corp., 83 F.3d 789, 797-98 (6th Cir. 1996); In re Lone Star Industries, Inc. Concrete R.R. Cross Ties Litig., 882 F. Supp. 482, 494 (D. Md. 1995) ("There is no legally cognizable mechanism for inquiring into the heads of jurors to determine their basis in awarding damages."), quoting Midwest Precision Services, Inc. v. PTM Indus. Corp., 887 F.2d 1128, 1140 (1st Cir. 1989).

Here, the jury had a range of options: from $24 million on the high side to $6.2 million on the low (Tr. 672-77). Glenayre offered no rebuttal; indeed, it made a conscious decision not to present any damage evidence or argument at trial -- not even in its closing argument. Its $450,000 theory advanced post-trial simply was never even asserted at trial.

Further, in reaching its conclusion that a $12 million lump-sum royalty was reasonable, the jury was permitted to consider all the pertinent evidence, including non-expert fact testimony by the inventor and by other witnesses like Messrs. Doggett and Cranman, and Glenayre's documents admitting that the technology covered by the '900 patent was the "cornerstone" of the company (DX-80, GLEI000755, and other evidence discussed in Subsection C, above). See, e.g., Catalina Lighting, Inc. v. Lamps Plus, Inc., 295 F.3d 1277, 1289-90 (Fed. Cir. 2002) (inventor testimony concerning what he would have accepted at the time infringement began); Radio Steel & Mfg. Co. v. MTD Products, Inc., 788 F.2d 1554, 1557 (Fed. Cir. 1986) (plaintiff's vice

21

president testified concerning profits); GNB Battery Technologies, Inc. v. Exide Corp., 886 F.Supp. 420, 432 (D. Del. 1995) (plaintiff's vice president testified "on the amount of royalty it considered reasonable"), aff'd mem., 78 F.3d 605 (Fed. Cir. 1996). Indeed, evidence of profit margin *alone* can constitute substantial evidence for the jury to award a particular reasonable royalty. LNP Engineering Plastics v. Miller Waste Mills, Inc., 2000 U.S. Dist. LEXIS 20888, at *25-*26 (D. Del. 2000) ("In light of Markey's testimony that RTP had a [REDACTED] profit margin on its accused products, the court finds that a reasonable jury could award LNP a 5% royalty rate."), aff'd, 275 F.3d 1347 (Fed. Cir. 2001); ALM Surgical Equipment Inc. v. Kirschner Medical Corp., 15 USPQ.2d 1241, 1250 (D.S.C. 1990) (plaintiff's president testified that "a reasonable royalty would be approximately 25%"). Again, nothing suggests the jury did not consider all the evidence.

### F.  The Jury's Damage Award Left Glenayre With A Generous Profit Margin

Even taking $40 million as the applicable sales base, it is neither surprising nor against the weight of the evidence that the jury found a 30% "reasonable royalty." For one thing, that still leaves to Glenayre a healthy profit margin of around 50%, based upon the trial evidence that actual margins were 77%-83% (Tr. 238; DX-81, DX-123). "A reasonable royalty is the amount that 'a person, desiring to manufacture [, use, or] sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make [, use, or] sell the patented article, in the market, at a reasonable profit.'" Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc., 750 F.2d 1552, 1568 (Fed. Cir. 1984) (alterations in original; citations omitted). Fifty percent profit is certainly reasonable.

In this case, the Court ruled on JMOL that there were no non-infringing alternatives (Tr.

614) -- a ruling Glenayre has not challenged post-trial. The jury was entitled to combine this fact

with Mr. Doggett's admission that "without the benefit of the security system," Glenayre's voice

mail "wouldn't be as salable a product," since "password-protected security is essential for a voice

messaging product" (Tr. 243). This could logically lead a reasonable jury to find that *without*

*Mr. Jackson's technology,* Glenayre would not have made *any* margin or profit, much less 50%

or more over what the inventor is paid. Thus, based upon profit margin evidence alone, the jury

could rightly have found Mr. Jackson entitled not only to 30% of revenues, but to even more of

Glenayre's infringing profits. Again, the Court ruled on JMOL that there were no alternatives

to Mr. Jackson's technology for a password-protected TOUCH TONE security system (Tr. 614).

### G. Glenayre's New Lump-Sum Royalty Calculation (Not Presented To The Jury) Ignores Its Own Royalty Payments

Glenayre's so-called maximum recovery of $450,000 (Br. at 7-8) not only ignores the

$2.99 million (Sony), $2.9 million (Panasonic), $2.6 million (Thomson) and $1.1 million (Bell

South) lump-sum payments that Mr. Jackson received from settlements after litigation (these were

excluded at trial, Exhibit B), it also ignores the 2.5% to 5% lump-sum royalties Mr. Jackson

received without litigation (PX-62A-F) and the 6% royalty Glenayre paid under the VMX license

(PX-63). Applying the 6% royalty Glenayre paid to the $40 million in sales Glenayre claims

occurred during the December 2001 through June 2003 period (Br. at 6) yields a lump-sum

payment of $2.4 million, not $450,000. But none of these arguments were ever made to the jury

because Glenayre elected to say nothing about damages. It advanced no theory. It gave the jury

no basis to reach any conclusion other than to find no infringement and award nothing (Tr. 717)

or to select a lump-sum payment in the $6.2 million to $24 million range proposed by Mr.

Jackson (Tr. 672-77).

23

Of importance, here, is the observation of former Chief Judge Markey of the Federal Circuit in Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978). Since the patent statute requires damages "adequate to compensate for the infringement," 35 U.S.C. § 284, an infringer who goes to trial and loses should always pay more than a good-faith licensee:

> The setting of a reasonable royalty after infringement cannot be treated, as it was here, as the equivalent of ordinary royalty negotiations among truly "willing" patent owners and licensees. That view would constitute a pretense that the infringement never happened. ... [T]he infringer would have nothing to lose, and everything to gain if he could count on paying only the normal, routine royalty non-infringers might have paid. As said by this court in another context, the infringer would be in a "heads-I-win, tails-you-lose" position.

Id. at 1158; see also, Transclean Corp. v. Bridgewood Servs. Inc., 2001 U.S. Dist. LEXIS 24383, *63 (D. Minn. 2001) ("In some cases, the use of a willing licensee-willing licensor model for determining damages may place an infringer in a no-lose position which actually rewards the infringer for not negotiating a royalty prior to its infringement."), aff'd, 290 F.3d 1364 (Fed. Cir. 2002).

Juries are, therefore, permitted to calculate royalties within the ranges suggested by the evidence. Unisplay, 69 F.3d at 519; Smithkline Diagnostics, 926 F.2d at 1167. And a royalty of $12 million on $40 million in sales (30%) is not excessive. In a case tried before this Court, Calabrese v. Square D, Civil Action No. 97 C 2199, the jury awarded $13.2 million in damages on $29 million in sales (45.5%) (See Jury Verdict, Exhibit C). In many other cases, summarized below, royalties at or in excess of 30% have been found reasonable.

"Reasonable royalties" exceeding an infringer's profits and even exceeding an infringer's gross sales are commonplace in patent infringement cases. See, e.g., State Industries, Inc. v.

Mor-Flo Industries, Inc., 883 F.2d 1573, 1580 (Fed. Cir. 1989) ("There is no rule that a royalty

be no higher than the infringer's net profit margin."); Panduit, 575 F.2d at 1164 (patent

infringement damage awards are not "designed to insure the anomalous result of guaranteeing an

actual profit to an infringer"); Stickle v. Heublein, Inc., 716 F.2d 1550, 1563 (Fed. Cir. 1983)

(royalty need not even be less than price of infringing unit); Snellman v. Ricoh Co., 862 F.2d

283, 289 (Fed. Cir. 1988) (damages more than four times Ricoh's total sales); Radio Steel & Mfg.

Co. v. MTD Products, Inc., 788 F.2d 1554, 1557 (Fed. Cir. 1986) (in upholding a royalty rate

which exceeded actual profits, the court stated: "a reasonable royalty, however, is based not on

the infringer's profit, but on the royalty to which a willing licensor and a willing licensee would

have agreed at the time the infringement began"); Mahurkar v. C.R. Bard, 79 F.3d 1572, 1580

(Fed. Cir. 1996) (25.88% royalty that exceeded profits of 25% found reasonable); Jonathan

Arnold, et al., "The Law And Economics Of Reasonable Royalty Damages After Black &

Decker's 'Snakelight' Litigation", Federal Circuit Bar Journal, Vol. 7, No. 4, pp. 373-90 (Winter

1997) (damages award equal to 125% of infringer's sales price); TWM Mfg. v. Dura Corp., 789

F.2d 895, 899 (Fed. Cir. 1986) (upholding award of 30% royalty where gross profits were 52.7%

of infringing sales, compared to Glenayre's 74% to 83% figure); Promega Corp. v. Lifecodes

Corp., 1999 U.S. Dist. LEXIS 21094, *44 (D. Ut. 1999) (awarding a 22% royalty rate); Pentech

International, Inc. v. Hayduchok, 931 F.Supp. 1167, 1174-77 (S.D.N.Y. 1996) (awarding a

royalty of 50% of the infringer's profits; calculated as one-half of net sales times profit margin);

Gasser Chair Co. v. Infanti Chair Mfg. Co., 943 F.Supp. 201, 216 (E.D.N.Y, 1996) (awarding

a royalty of 20% of the sales of infringing products), aff'd mem., 47 USPQ.2d 1208 (Fed. Cir.

1998); Hartness International Inc. v. Simplimatic Engineering Co., 819 F.2d 1100, 1106 (Fed.

25

Cir. 1987) (upholding award of 70% royalty on gross sales price); ALM Surgical, 15 USPQ.2d

at 1250 (upholding jury award of royalty equal to 20.3% of sales); Smithkline Diagnostics, 926

F.2d at 1168 (upholding district court's damage award of a royalty of 25% of the defendant's

sales). The jury's award here was neither excessive nor unreasonable.

## IV.  GLENAYRE IS NOT ENTITLED TO A REMITTITUR OF DAMAGES

A court-ordered reduction in the jury's damage award can be considered only under highly

unusual circumstances:

> Because fixing a damage award is an exercise in fact-finding, only those awards
> that are "monstrously excessive," born of passion and prejudice, or not rationally
> connected to the evidence may be altered. *Matter of Innovative Const. Systems,
> Inc.*, 793 F.2d 875, 887-888 (7th Cir. 1986) (citations omitted).

Pincus v. Pabst Brewing Co., 893 F.2d 1544, 1554 (7th Cir. 1990); Abernathy v. Superior

Hardwoods, Inc., 704 F.2d 963, 971 (7th Cir. 1983). No such "monstrously excessive" award

was made here -- the award amounts to only 3% of the $400 million earned by Glenayre since

infringement began; and less than 5% of the subscriber base revenues during the 1-1/2 year

damage period. The jury's choice was within the $24 million to $6.2 million range discussed at

trial. Under these circumstances, no remittitur is warranted -- especially since the $450,000

figure belatedly proposed by Glenayre was not even presented at trial.

Glenayre cites IPPV Enters. v. Echostar Communications Corp., 191 F. Supp. 2d 530,

573 (D. Del. 2002) in support of a remittitur. But the remittitur in IPPV occurred because the

jury relied on the patentee's damages expert improperly *exceeding* his original damages opinion.

The court, thus, reduced the award to the maximum original amount the damages expert testified

was due. IPPV simply does not apply. Likewise, Glenayre relies on Modine Mfg. Co. v. Allen

Group, Inc., 14 U.S.P.Q.2d 1210 (N.D. Cal. 1989). But in Modine, the 28% royalty was

26

remitted to 15% because (1) the 28% number was based on *assumptions* for figures used in the expert's royalty formula rather than evidence, and (2) the patentee's damages expert had never negotiated a royalty higher than 15%. Id. at 1221. Again, these fact-specific holdings do not translate here, especially when the evidence of record supports crediting the Jackson technology with *all* of Glenayre's profits, and the jury nonetheless let Glenayre keep more than 50%.

In any event, Glenayre's remittitur arguments look through the wrong end of the telescope. Glenayre relies on the Jackson license lump-sum amounts alone, without acknowledging they represent royalty rates. Glenayre's argument backfires. If absolute lump-sum license amounts were the only data the jury was permitted to consider, then the jury awarded far *less* than it was entitled to. For example, Glenayre's 6% MVP license would translate to a lump-sum of $24 million, even if one only considers revenues from 1989 forward. Hence, under Glenayre's own approach, the "maximum recoverable damages" are $24 million.

## V. SUBSTANTIAL EVIDENCE ALSO SUPPORTS THE JURY'S FINDING OF INFRINGEMENT

Perhaps Glenayre shows its desperation best when it argues that Mr. Jackson misunderstood his own invention and that Dr. Silva got it wrong to boot. Glenayre's brief states, "Jackson argued that Claims 5 and 79 cover the general concept of using Touch-tone passwords in a voicemail system" (Glenayre Br. 1, 12). On the contrary, Mr. Jackson and Dr. Silva both faithfully testified throughout the trial about each and every claim limitation, not some "general concept" of passwords. Mr. Jackson acknowledged he did *not* invent the "general concept," but that there were "crude ways" to have Touch Tone passwords before his. (Tr. 209). None of those prior "crude ways" constituted an acceptable non-infringing substitute. (Tr. 614).

### A.    Literal Infringement Is A Question Of Fact

"The scope of literally infringing 'equivalents' under § 112 ¶6 is a factual determination." Symbol Technologies, Inc. v. Opticon, Inc., 935 F.2d 1569, 1575 (Fed. Cir. 1991); Carroll Touch, Inc. v. Electro Mechanical Systems, Inc., 15 F.3d 1573, 1578 (Fed. Cir. 1993). Glenayre acquiesced in placing that issue before the jury by submitting an *agreed* jury instruction that informed the jury that it was to decide the issue of equivalence under 35 U.S.C. § 112, ¶ 6 as a question of fact (Tr. 737-39).

Faced with conflicting evidence about how an accused device works, it is the jury's responsibility to resolve the conflict. Hilgraeve Corp. v. Symantec Corp., 265 F.3d 1336, 1344 (Fed. Cir. 2001). As to those fact issues, the standard on JMOL is whether "substantial evidence" supports the verdict. Tec Air, Inc. v. Denso Mfg. Michigan Inc., 192 F.3d 1353, 1357 (Fed. Cir. 1999). Hence, Glenayre can prevail on its motion JMOL only "if *no* reasonable person could have reached a verdict for [Mr. Jackson] in light of the record before the jury." Tec Air, 192 F.3d at 1358.

### B.    There Is Substantial Evidence Of Literal Infringement Of Each "Means Plus Function" Clause

Glenayre conceded that its MVP performs all the same functions required by claims 5 and 79 of Mr. Jackson's patent. As for equivalence of structures -- the fact question for the jury -- the jury instructions included a detailed tabulation showing exactly where in Mr. Jackson's patent the structures corresponding to each "means plus function" limitation was found -- even including reference numbers from the patent drawings, in a column Glenayre inexplicably omits from its JMOL brief. Each juror had a copy of that table. The jury was also instructed:

28

> Equivalent of structures. Infringement of a means plus function clause requires that the relevant structure and the accused MVP product must perform the identical function recited in the claim and be identical or equivalent to the corresponding structure and the application.
>
> The functional identity [and] either structural identity or equivalents are both necessary. The accused MVP product must: One, perform the identical function recited in the means clause; and, two, perform that function using the structure disclosed in the specification or an equivalent structure.

(Tr. 738-39). Finally, the verdict form (which Glenayre itself proposed) also required the jury to focus on the requirement of structural identity or equivalence of structure separately for each and every "means plus function" clause (Tr. 746-48).

Most of the jurors conscientiously took notes throughout the trial (Tr. 654). During deliberation, the jury requested and was given a copy of the trial testimony of Dr. Silva, Mr. Samuels and Mr. Bettis (Tr. 751-754), in total nearly 212 pages of testimony constituting nearly the entirety of everything presented at trial on the subject of infringement. The jury then asked for assistance on the definitions of "substantial" and "insubstantial" (Tr. 755) and was correctly informed that the issue of Section 112, paragraph 6 equivalents was a fact issue for it to decide:

> ... So, I asked the jurors what words they wished to be defined, and it was "substantial" and "insubstantial."
>
> So, after conferring with the lawyers, we agreed not to give them a definition, but to tell them that they were to be used in their ordinary sense, and that it was a jury question whether it was substantial or insubstantial. That was my communication to the jury.

(Tr. 755). The jury instruction on Section 112, paragraph 6 equivalents made specific reference to the words "substantial" and "insubstantial," which shows unequivocally that the jury was, in fact, considering each means-plus-function element of claims 5 and 79 and was properly deciding *as a matter of fact* whether the MVP product had equivalent structure:

Equivalents of structure turns on whether the differences between the structure in the accused device and any disclosed in the specifications are **insubstantial**. Put another way, there is equivalents of structure of the asserted equivalent structure if the accused MVP product performs the claimed function in **substantially** the same way to achieve **substantially** the same result as the corresponding structure described in the specification.

(Tr. 739) (emphasis added).

### C. Glenayre Itself Urged The Jury To Decide The Case On The Basis Of The Experts' Credibility

That credibility was the key issue in the case is precisely why the jury sought the actual testimony of the conflicting experts Silva and Samuels and that of Mr. Bettis, as well. Credibility was the thrust of Glenayre's entire closing argument, which began and ended by disparaging Dr. Silva's veracity and extolling that of Mr. Samuels, Glenayre's expert, and of other Glenayre witnesses:

> [MR. MANN] When we started this case last week, I told you a couple of things. One of the things I said was it's your job to figure out who is telling the truth. That's why we have juries. It's the jury's job to assess the credibility of witnesses; to see whether stories make sense; whether things ring true; whether what you're hearing actually fits in with your own experience. "Am I getting the straight story here?" That's your job. And that's why we're having this trial. And that's why we're presenting evidence to you and making these arguments.

(Tr. 681). Driving the point home again, Glenayre argued:

> Now, in order to find infringement, in order for you to return a verdict against Glenayre, you have to credit Dr. Silva's testimony. You have to find that Dr. Silva was telling the truth. You have to find that Dr. Silva came to the right conclusions.

(Tr. 684).

> Now, for this -- on these two bases alone, general credibility and his expertise, you can decide that Dr. Silva's testimony is entirely incredible and ignore it. And if you do so, you can say that there's no infringement. **You can decide the case on that basis alone.** And on that basis, you can find for Glenayre.

30

(Tr. 690; emphasis added).

Again and again, Glenayre emphasized that the jury should believe Mr. Samuels and not

Dr. Silva:

> Let's talk about demeanor. How he looks, how he sounds, how he answers questions. You saw him up here. He answered questions openly. He answered the questions honestly. He didn't try to hide. He didn't try to say "I don't know" or "I don't remember" or "I don't understand your question." There was no evasion on the part of Mr. Samuels. He's an example of what an expert should be. He has no interest in this case. He has expertise in a certain area. He's looked into certain things, and he said, "This is what I think. Based on what I know, this is what I think."

(Tr. 702).

> Now, let's talk a little bit about Sonny Bettis. You remember Sonny Bettis. Again, I don't think there are any issues with his honesty or his openness. We saw him testify. We saw him answer questions fully and fairly, and that was both for our side and during cross-examination. And Mr. Bettis knows more about the MVP than anyone.

(Tr. 711).

> *And I ask you, again, to consider his demeanor; consider how he answered the questions. Credibility is key in this case. That's what this case is all about.*

(Tr. 715; emphasis added). These are Glenayre's words -- the argument it made to the jury at the

close of the case.

That the jury, after considering all the evidence, chose to credit Dr. Silva and not Mr.

Samuels is exactly what juries are required to do -- it's what Glenayre asked them to do; it's what

the Court instructed them to do:

> The credibility of witnesses and weight of the evidence. With respect to all forms of evidence properly considered by you, you, the jurors, are the sole judges of the credibility of the witnesses and of the weight and effect their testimony deserves. You are the sole judges of the credibility of the witnesses.

31

* * * *

> Opinion testimony may be judged just like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves, considering the witness' education and experience, the reason given for the opinion and all the other evidence in the case.

(Tr. 730, 733). Having framed the issue of infringement as a contest of credibility, Glenayre cannot now complain that the jury chose to believe Dr. Silva and not Mr. Samuels.

> **D.      Glenayre's Own Emphasis On Expert Testimony About Infringement Was Consistent With Federal Circuit Precedent, Which Permits Experts To Testify To Their Conclusions About Means Plus Function Claims Without Even Discussing Underlying Facts Or Data**

The gist of all of Glenayre's post-trial arguments about the "sufficiency of the evidence" showing infringement of the "means plus function" claims is that Dr. Silva's expert testimony was "not particularized," was "unsupported" and allegedly was "inconsistent" with the testimony of Glenayre's witness Bettis. With respect to "consistency," of course, the jury was perfectly entitled to believe Dr. Silva and to reject any or all of Mr. Bettis' testimony. See Comark Communications, 156 F.3d at 1192 (discussed in Section I, above); Agreed Jury Instruction concerning expert witness testimony, Tr. 732-33, quoted in Section V-C, above.

Glenayre's argument at p. 11 of its brief that a patent owner "must provide evidence in the form of particularized testimony" in order to show equivalence of structure under 35 U.S.C. § 112, ¶ 6 is simply wrong as a matter of law.

> Newbridge next contends that Lucent was required to present particularized testimony and linking argument with regard to the "means-plus-function" elements in Claim 21 of the Eckberg '810 Patent. ... While both the Supreme Court and the Federal Circuit have recognized that the test for structural equivalence under § 112, ¶6 and the test for infringement under the doctrine of equivalence are closely related in that they both invoke the concept of insubstantial change, neither court has found the doctrine of equivalents test or analysis to be wholly transferable to the § 112, ¶6 statutory equivalence context. ... *As for the particularized testimony*

> ***and linking argument requirement under the doctrine of equivalents, the Court is unaware of, and Newbridge has not identified, any case where this requirement has been extended to cover § 112, ¶6 equivalence. Indeed, insofar as the Court is aware, more generalized testimony from expert witnesses has been sufficient to establish literal infringement where § 112, ¶ 6 limitations are involved.** ... Accordingly, the Court declines to adopt Newbridge's argument that Lucent was required to show particularized testimony and linking argument.

Lucent Technologies, Inc. v. Newbridge Networks Corp., 168 F. Supp. 2d 181, 211-12 (D. Del.

2001) (emphasis added) (citing Symbol Technologies, 935 F.2d at 1574-75, and denying

infringer's post-trial motion for JMOL of non-infringement).

Glenayre misapprehends the nature of expert testimony at trial concerning means-plus-

function claim limitations. Glenayre's litigation strategy was not to challenge Dr. Silva's

qualifications and, under Fed.R.Evid. 705, Dr. Silva was authorized to testify to his conclusions

even without discussing underlying facts or data. In Symbol Technologies, the Federal Circuit

upheld a finding of infringement where the patentee's expert witness presented a claim chart

identifying particular components of the accused device with each means-plus-function claim

limitation. Beyond the claim chart, the expert presented no detailed analysis linking the particular

parts of the accused device with the claimed elements. 935 F.2d at 1574-75. The Federal Circuit

explained:

> [On appeal, the infringer] argues that [the expert] must have misunderstood this task, because he testified on the ultimate issue of infringement without discussing in detail equivalency between the structures of the accused devices and the structures disclosed in the patent specifications. However, testimony on the ultimate issue of infringement is permissible in patent cases. ... The responsibility for challenging the factual underpinnings of the testimony fell squarely on [the infringer] during cross-examination. ... [The infringer] failed to seize the opportunity, provided by the Rule, to demonstrate that [the expert's] opinion testimony was factually incorrect.
>
> Rule 705 functions to abbreviate trials by permitting opinion testimony without factual foundation. We see no reason why Rule 705 is not fully applicable

33

to patent trials and opinion testimony on infringement of claims under § 112 ¶6. ... Finally, the specific purpose behind Rule 705 is to avoid complex and time consuming testimony by permitting an expert to state his opinion and reasons without first specifying the data upon which it is based. ... Patent cases, so often typified by lengthy testimony on complex technical issues, are particularly served by this purpose.

In short, [the patent owner] was permitted to rest its *prima facie* case on [its] expert testimony, including charts, that the patents were infringed, and the District Court was free to accept or reject that evidence.

Symbol Technologies, 935 F.2d at 1575-76; see also, Arthur A. Collins, Inc. v. Northern Telecom Limited, 216 F.3d 1042, 1047 (Fed. Cir. 2000) (an expert's mere conclusion "that the critical claim limitation is found in the accused device" may be sufficient to constitute substantial evidence of infringement, because "the opposing party can challenge the factual basis of the expert's opinion during cross-examination"); Rohm & Haas Co. v. Brotech Corp., 127 F.3d 1089, 1091-92 (Fed. Cir. 1997) (recognizing rule of Symbol Technologies and emphasizing that it is up to the trier of fact to decide whether to accept or reject such summary testimony in view of cross-examination); Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627-28 (1944) (where trial court admits opinion testimony, it is for jury to decide what, if any, weight to assign it).

In short, all Dr. Silva had to do (at the risk of being disbelieved by the jury) was to summarize his conclusions about each means-plus-function claim limitation. (Of course, he did much more.) Dr. Silva filled out claim charts during his direct testimony, about which he was cross-examined (Tr. 446); those charts were discussed at length by both parties in their closing arguments as well (Tr. 658, 663, 666, 713, 720). This Court need go no further to deny Glenayre's motion -- indeed, under the law it would be improper to go any further. The ineffectiveness of Glenayre's cross-examination of Dr. Silva, as in Lucent Technologies, is no basis for entry of judgment of non-infringement in the face of the jury's factual determinations.

34

E. **There Was Substantial Evidence The MVP**
**Had A Gate Means Coupled To A Detecting Means**

Glenayre now argues that there was no trial testimony concerning whether the gate means

in the MVP was coupled to the detecting means. (Indeed, this was the *only* "sufficiency of the

evidence" objection Glenayre preserved by a proper Fed.R.Civ.P. 50(a) motion at the close of all

the evidence.) But Glenayre is wrong. Glenayre's expert Samuels admitted that there *was* such

testimony from Dr. Silva:

> Q.      I'd like to read for you Dr. Silva's testimony as to where he found
> a gate means in the central controller, and we'll see if that aids in finding it.
>
> MR. DONOHUE: And the reference is on Page 355 of the daily transcript,
> Lines 17 through 19.
>
> BY MR. DONOHUE: Q. "Well, it's a -- it's a portion of the logic
> circuitry and the central controller that doesn't permit entry of codes until after a
> proper access sequence has been received."
>
> Does that help you find it?
>
> A.      Well, I think he has identified somewhere in the million lines of
> code of the central controller that there might be this gate means. But that doesn't
> seem like a very specific reference to me.

(Tr. 595). This last assertion of Mr. Samuels, of course, was simply wrong: courts have found

structural equivalency between hard-wired digital circuitry and later microprocessor designs that

use the same basic gates -- AND, OR, XOR, exclusive OR and NOT. In Interactive Pictures

Corp. v. Infinite Pictures, Inc., 274 F.3d 1371 (Fed. Cir. 2001), the Federal Circuit held:

> [W]e have upheld determinations of equivalence [under 35 U.S.C. §112, ¶ 6] on
> the ground that hardware and software implementations of a component of an
> invention are interchangeable substitutes, *Overhead Door Corp. v. Chamberlain
> Group, Inc., 194 F.3d 1261, 1269-70, 52 U.S.P.Q.2D (BNA) 1321, 1326 (Fed.
> Cir. 1999),* even though such a substitution would require ancillary changes in
> affected circuitry and packaging. Rather than focusing on physical or electronic
> compatibility, the known interchangeability test looks to the knowledge of a skilled

artisan to see whether that artisan would contemplate the interchange as a design choice. *Id.* Viewed in that light, Birdwell's testimony that the claimed digital fisheye image and SmoothMove's (R) equirectangular panorama file are "interchangeable alternatives" is substantial evidence supporting equivalence.

Interactive Pictures, 274 F.3d at 1383.

Ultimately, Glenayre's gripe comes down to a complaint that Dr. Silva did not repeat in his testimony often enough the phrase "gate means coupled to said detecting means." But, the jury had before it the MVP product itself and the explanation given by Mr. Bettis (Tr. 544-68); it was perfectly capable of concluding for itself that the gating means was coupled to the detecting means and, therefore, that there was literal infringement. See Alco Standard Corp. v. Tennessee Valley Authority, 808 F.2d 1490, 1503 (Fed. Cir. 1986) (product manual was "adequate to support the district court's finding that [defendant] infringed...."). The jury was instructed it had to find the gate means coupled to the detecting means in order to reach its conclusion of infringement, and it explicitly found "gate means" on the verdict form. Glenayre is merely asking this Court to substitute its judgment for that of the jury, which is impermissible in deciding a motion JMOL. Perkin Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893 (Fed. Cir. 1984).

Frankly, the most compelling evidence of "coupling" was contained in the MVP device itself that Glenayre brought into the courtroom. Mr. Bettis demonstrated it to the jury. He showed the interconnected shelves (Tr. 545); he explained how "the time space controller really interfaces the control shelf back to all these other shelves to allow them to talk" (Tr. 546). He explained how the DSP communicates with the TSC (Tr. 549) and how the TSC, in turn, communicates with the central processor (Tr. 550) ("... the TSC and the central controller, it's always communicating through this one buffer." Tr. 550). Mr. Bettis then explained how each

36

component is coupled to the other: "So as soon as the DSP recodes a digit, it's just going to forward it on to the TSC and then on up to the central, just basically one digit at a time" (Tr. 551). The jurors could see the "coupling" with their own eyes.

Yet, there is even more evidence of the existence of a "gate means" coupled to a "detecting means" from both Mr. Bettis and Dr. Silva (Tr. 355-58) and, contrary to Glenayre's assertion (Br. 16-17), there was evidence that the MVP "doesn't permit entry of codes until after a proper access sequence has been received":

> Q.     Does the Glenayre system have a gate means?
>
> A.     Yes, sir.
>
> Q.     And what is it?
>
> A.     Well, it's a, it's a portion of the logic circuitry in the central controller that doesn't permit entry of codes until after a proper access sequence has been received.

(Tr. 355). Mr. Hawn's testimony (Tr. 288-89) and Mr. Silver's testimony (Tr. 291-94) is completely in line with that of Dr. Silva. And Mr. Bettis confirmed on direct examination (Tr. 550-53) that the TSC (part of the "detecting means") is not in "command" mode (detecting DTMF commands) during password entry, but is only in such a command detecting mode *after* a valid password is entered (Tr. 550-54). Then, on cross examination, Mr. Bettis again confirmed that the MVP "blocks access" to the voice messaging system when wrong access codes are entered, either the wrong number of digits or the wrong sequence of digits (Tr. 566-67, 569). That is what "preventing the detecting means from producing a sequence detection signal" is all about. This alone is sufficient evidence from which the jury could (and did) find infringement.

Glenayre's next gripe is that the detecting means is allegedly "in a different part of the

37

MVP" than the "gate means" (Br. 17-18). The simple answer, of course, is "so what?" The claim says the gate means is "coupled" to the detecting means, not "in the same part" as the detecting means. Nothing in the claim requires the "gate means" and the "detecting means" to be "in the same part" of the accused device. And again, the law does not require one-to-one correspondence between the patent and the accused product of the individual components that make up a claimed structure. See, e.g., Caterpillar Inc. v. Deere & Co., 224 F.3d 1374, 1380 (Fed. Cir. 2000) ("... *the district court conducted an impermissible component-by-component analysis* to determine that no reasonable jury could find structural equivalence.") (emphasis added); Odetics, Inc. v. Storage Technology Corp., 185 F.3d 1259, 1271 (Fed. Cir. 1999) (rejecting "component by component" analysis); see also, the Court's 2/18/03 Order at 24-25, Exhibit D, applying Caterpillar). Glenayre's argument -- which is tellingly unsupported by any legal analysis -- is wrong as a matter of law.

## F.     There Was Substantial Evidence The MVP Had A "Control Means"

Nothing was said by Glenayre about "control means" in any motion JMOL at the close of all the evidence. Even the motion Glenayre presented at the close of Mr. Jackson's case dealt not with "control means," but rather was limited to "access limiting circuit means" (Tr. 519). Since "control means" was not so much as mentioned in any motion JMOL (not a single word was said about it), Glenayre certainly waived any "sufficiency of the evidence" challenge to the existence of a "control means." Duro-Last, 321 F.3d at 1108; see Section II-B, above.

Nevertheless, Glenayre belatedly urges this Court to substitute Mr. Samuels' opinion (which the jury rejected) for the jury's factual determination on the subject of "control means" (Br. 12-15). Even if it were not too late for that (which it is), Glenayre's argument lacks merit.

Dr. Silva testified about both the structure and function of the "control means" required by the claim:

> Q.    All right.  I'd like to turn to Exhibit 165, which is the control means.  What structure in the patent describes the control means?  That's right here.
>
> A.    Well, that's in, shown in purple, and consists of flip-flop No. 66 and OR gate No. 64.
>
> Q.    And what's the function of the control means?
>
> A.    That's to produce a control signal in response to the sequence detection signal.

(Tr. 341).  This was fully consistent with the claim interpretation given to the jury, which described the "function" of the control means as "to respond to the sequence detection signal produced by the detecting means by producing a corresponding control signal."  Dr. Silva also explained where the "control means" is found in the Glenayre MVP:

> A.    Well, that's the, it's in the central controller, and it's gates and flip-flops that control the various functions that are made part of the Glenayre equipment, that is, it plays messages, it will change date and time stamps, there are lots of functions that it has that are then controllable by control codes that you enter into the equipment after you once gained access to it.  So it must have control means that permit those control codes to eventually be executed.

(Tr. 358). And he explained why Mr. Bettis' testimony was consistent with his own (Tr. 359-60). Glenayre's reliance on Mr. Bettis' attempt at trial to disavow his own previous admissions (Br. 14-15) must be disregarded; the jury not only read his testimony, it also heard him try to explain away what he had previously said, and found that attempt unconvincing.

The phrase "control means" does not even appear in Glenayre's cross examination of Dr. Silva.  Just as in Symbol Technologies, therefore, Glenayre's tactical decision not to cross examine Dr. Silva on this subject in the hope the jury would disbelieve him backfired.  See 935

F.2d at 1575-76. The jury was entitled to (and did) believe his testimony, which explained how the "control means" works and where it is, and to disregard Glenayre's contrary arguments and protestations that Mr. Bettis didn't really mean what he said in his own sworn testimony.

And Glenayre's so-called "one, and only one" construction of "corresponding control signal" (Glenayre Br. 13) is neither in the claims nor the Court's <u>Markman</u> ruling. Nor did Glenayre even make such an argument until after it lost the trial.

### G. There Was Substantial Evidence Glenayre's MVP Had An "Access Limiting Circuit Means"

This Court already has held that "Glenayre does not contest that the MVP performs the identical, or an equivalent, function of the access limiting circuit means (which, as explained, is to prevent access to the system unless an access code is first received)" (Court's 2/18/03 Order, Exhibit D at 23). Glenayre's witness Doggett reiterated that concession at trial:

> Q.      I have a different question for you. I realize you want to say these things, but am I correct that without the benefit of the security system in your voicemail, VMPs or VPMs, they wouldn't be as salable a product, right?
>
> A.      Absolutely, password-protected security is essential for a voice messaging product. It has been from the initial introduction.

(Tr. 243). Mr. Silvers, of TDS Metrocom, a user of the Glenayre MVP device, confirmed that one function of that device is to prevent a sequence detection signal from being produced, and therefore to prevent access, until after the phone line receives a predetermined sequence of predetermined DTMF tone signals constituting an access code (Tr. 290-95).

Contrary to Glenayre's post-trial assertion that Dr. Silva provided insufficient analysis, as for equivalence of structure, he explained the structure in the Jackson patent that comprises the "access limiting circuit means" (Tr. 335-36, 342-44), and even why the patent recognized the

40

possibility of changing codes -- for example, by changing the number of digits (Tr. 336-37). He

testified that he had analyzed the 68000 microprocessor used in the Glenayre MVP (Tr. 318-19)

and that he had studied the Motorola patent describing that microprocessor (Tr. 313-15, 320-21).

He explained that the operation of software in the 68000 microprocessor "empowers certain

sections of the microprocessor -- the gates -- and it effectively connects together the gates and

performs logical functions, so that the microprocessor could do what it's designed to do. ... And

then another thing is by observing the behavior of the microprocessor and looking at the software

code, you know what gates are there and what they're doing" (Tr. 315-16). With respect to the

"access limiting circuit means" specifically, Dr. Silva testified:

> Q. Now, I'd like to show you Defendant's Exhibit 1, which is Mr.
> Jackson's patent, and direct your attention to what we've been spending a lot of
> time on. That's Figure 3 and the predecessor, Figure 2. Can you tell us whether
> the components that are shown in Figure 2 -- Figure 3, rather -- for this
> access-limiting circuit are the same as or different than the electrical components
> that would be present inside a microprocessor?
>
> A. They're exactly the same.
>
> Q. Is that true with respect to the 68000 microprocessor that's used by
> Glenayre for its MVPs?
>
> A. Yes, it is.
>
> Q. And can those circuits and components be combined to create the
> same circuitry inside the microprocessor?
>
> A. Exactly. That's exactly what Glenayre has done.

(Tr. 316-17). Critically, this form of hardware/software interchangeability was known at the time

the application for the '900 patent was filed (Tr. 316), as established by specific drawings in a

contemporaneous textbook (Tr. 317-18). In summary:

41

Q.    All right.  In your opinion, does the Glenayre system, which is accused of infringement in this case, have an access limiting circuit means?

A.    Absolutely.

Q.    And does it have an integrated circuit access limited means?

A.    Absolutely.

Q.    Does it perform the same function?

A.    Absolutely.

Q.    Does it do so in substantially the same way?

A.    It does it in substantially the same way, and you wind up with the same result.  It does the same thing when you are done.

(Tr. 352-53).

Dr. Silva's testimony was more than sufficient to establish substantial similarity between hardware in Mr. Jackson's patent and the microprocessor-based "access limiting means" in the Glenayre MVP.  Interactive Pictures, 274 F.3d at 1383 (hardware/software interchangeability); Symbol Technologies, 935 F.2d at 1575-76 (limited scope of expert testimony needed in means plus function claims); Collins, 216 F.3d at 1047 (same).

Glenayre now complains that it cannot infringe because, it asserts, its MVP "collects all the digits in the password and then, once all the digits have been collected (whether correct or not), it compares them with the stored password" -- a procedure it claims is different from what Mr. Jackson's patent calls for (Br. 21).  But, Dr. Silva testified to the contrary:

Q.    And what's verification then?

A.    Well, verification is when the, that's the last step, the right code has been entered and the right number of tones, it will get, give a good output, and, in fact, it doesn't give a bad output is basically what it does, and it permits access to the system.

42

> Q.     Is there any verification that takes place before you get everything in there?
>
> A.     No, sir.  That happens at the end.
>
> Q.     All right.  So you get everything in there, then you verify?
>
> A.     That's right.
>
> Q.     And if I understand it, you are verifying two things: you have the right number of digits, and they are in the right sequence?
>
> A.     Exactly. ... And the right digits, right digits in the right sequence and the right number.
>
> Q.     Which adds up to the right code, you can now continue?
>
> A.     Now you have access, yes, sir.

(Tr. 344-45).  Again, insubstantial difference -- in fact, no difference at all.  The jury was entitled to believe Dr. Silva in preference to Glenayre's witnesses on this point.  And although Glenayre makes much of the "way" portion of the "function/way/result" test, that test is only one approach among several to the primary question of "insubstantial difference."  Zelinski v. Brunswick Corp., 185 F.3d 1311, 1316 (Fed. Cir. 1999).

Again, Glenayre's post-trial argument focuses on individual components of the overall access limiting structure -- various flip-flops in a chain, gates and the like (Br. 21) -- a wrong approach as a matter of law (see Court's 2/18/03 Order, Exhibit D at 24-25).  Glenayre's post-trial brief is an exercise in "impermissible component-by-component analysis," in contrast to the consideration of the overall structure corresponding to the means-plus-function claim limitation which the law requires.

Finally, Glenayre claims that "undisputed testimony" showed "the '900 patent does not work" (Br. 22) -- but in fact, the cited testimony (Tr. 444) consists merely of Dr. Silva answering

a hypothetical question while explaining that the basis for the hypothetical was wrong. In short, Glenayre has shown no reason the jury should have rejected the substantial evidence that Glenayre's MVP has an "access limiting circuit means." This Court already has rejected Glenayre's argument that no reasonable jury could find equivalence between what Glenayre claims is its "string compare password validation technique" and the '900 patent's "access limiting circuit means" (Order, 3/19/03, Exhibit E). As this Court held during the trial:

> MR. DONAHUE: That is not what they both do, Your Honor. There has been no dispute that the MVP does not check the digits in the password until at the end when it does --
>
> THE COURT: I understand that. They do it at the end, and that was -- I wrote about that, and I said that's obviously a difference. But what I think I said was *it would be for the jury to tell* if it was insubstantial or whether it's a substantial difference.
>
> \* \* \* \*
>
> THE COURT: Well, you may be right, but I think *it's a question for the jury to tell us* whether you are or not. It seems to me, at least at this point in the evidence, that they are either the same or they do the same things in substantially similar methods, so the motion is denied.

(Tr. 520-21; emphasis added).

## H.    There Was Substantial Evidence The MVP Had A Counter Means

Glenayre's argument about "counter means," like its other non-infringement assertions, begins by creating a non-existent "requirement" for "particularized testimony" (Br. 22). The law is exactly the opposite (see Subsection D, above), which is reason enough to reject Glenayre's argument.

But, in any case, there was substantial evidence the MVP had a "counter means." Dr. Silva testified:

44

Q.      What is shown right here now?

A.      What we are showing here is we're relating the digit storage function to the source code that is responsible for that in the Glenayre system, and that's in the green box. In the counter box, we have the source code or portions of the source code that are responsible for the counting function.

(Tr. 349).

Q.      Okay. We go back to counter. What's that source code mean there?

A.      Well, there is a, in the counter, there is a function that's called TMT col. That is a statement that prompts the user to enter tones into the phone. It's asking him for his password. Td is task data, it's data structure that gets called out. 103 points to a bunch of comments that the system will make. Password size, that's the number of digits that are in the password for that particular subscriber. See, a subscriber has dialed into the system, and so the system knows that it's Roy Silva dialing in, and previously I've told it what my password is. Therefore, it knows what it is and how long it is. So it will know the password size, and 3 is an identifier. Finally, the comment in between the slashes, the /* and then */, that's not compiled by the C compiler. That's what's called a comment, and that's telling us, it says terminate if the maximum number of digits is received. And then there is an next statement, that's an if statement, and that's a conditional statement that's tested each time if the number of digits have been received equal to what's in the password, what's been collected, it returns a yes, and it meant that means the counter has counted up to the number of digits in the password.

(Tr. 351; see also, Tr. 449-50)

Q.      And does the Glenayre MVP have a counter means?

A.      Yes, sir.

Q.      What is that counter means?

A.      Well, that's the electronic circuits that were empowered by that code we were discussing just a few minutes ago.

(Tr. 355).

As for being "coupled to said gate means" (Br. 22-23), "coupling" was shown in Glenayre's MVP and in Mr. Bettis' explanation of how it worked (Tr. 545-55). The jury

45

instructions required the jury to find coupling; it is presumed the jury followed those instructions.

Moreover, the "counter means" source code Dr. Silva identified (Tr. 449) and the "gate means" source code Dr. Silva identified (Tr. 451) are each contained in a single source code document (DX-102) which the Court admitted into evidence without objection (Tr. 460-61). The jury had those portions of DX-102 during deliberations which contain the cited source code. The jury could see with their own eyes that the MVP counter means code and the MVP gate means code are each contained in the *very same source code running on the very same microprocessor in the MVP.* Glenayre's argument that the jury could not find them "coupled" flies in the face of this evidence.

I.    <u>**Glenayre's Two Cases Do Not Support Its Position**</u>

Glenayre also ignores the substantive law dealing with "means plus function" claims, citing only two cases at p. 11 of its brief, both for the proposition that "particularized testimony" about "insubstantial differences" relating to means plus function claims is required. As shown in Subsection D, above, that is wrong as a matter of law. Glenayre simply ignores the controlling case law on that subject: <u>Symbol Technologies</u>, <u>Collins</u> and <u>Lucent</u>.

Neither of the cases Glenayre does cite supports its position. In <u>Alpex Computer Corp.</u> v. <u>Nintendo Co.</u>, 102 F.3d 1214 (Fed. Cir. 1996), the jury was given the job of interpreting the patent claim, <u>id.</u> at 1219, in contrast to the detailed claim interpretations given to the jury here. Further, there was *no evidence* concerning structure; only function was discussed. <u>Id.</u> at 1222. In this case, Dr. Silva testified at length about the structure of the MVP device. And the decision of the Texas district court in <u>Altech Controls Corp.</u> v. <u>E.I.L. Instruments, Inc.</u>, 71 F.Supp.2d 677, 683 (S.D. Tx. 1999), simply reiterates the holding that there must be evidence about the

structure of the accused device. (Altech referred to "particularized testimony in the context of the doctrine of equivalents, not equivalence of structure under 35 U.S.C. §112, ¶6, which is the issue here.) Neither case supports Glenayre.

## VI.    GLENAYRE'S REQUEST FOR A NEW TRIAL SHOULD BE DENIED

Glenayre's perfunctory request for a new trial on liability and on damages (Br. 4, 25) suffers from the same infirmity as its request for judgment as a matter of law: Glenayre argues solely from the evidence that it perceives as favorable to its own position. That is not enough.

Glenayre bears the burden of proving it is entitled to a new trial. Wright, Miller & Kane, 11 Federal Practice and Procedure §2803, at pp. 46-47 (1995). Perhaps most importantly, under Fed.R.Civ.P. 59,

> The mere fact that the evidence is in conflict is not enough to set aside the verdict. *Indeed the more sharply the evidence conflicts, the more reluctant the judge should be to substitute his judgment for that of the jury.*

Wright, Miller & Kane, 11 Federal Practice and Procedure § 2806, at pp. 66-67 (1995) (emphasis added; collecting cases); Data Line Corp. v. Micro Technologies, Inc., 813 F.2d 1196, 1201 (Fed. Cir. 1987) ("The trial court did not abuse its discretion by refusing to grant a motion for a new trial based on defendant's disagreement with the testimony.").

> In reviewing a motion for a new trial, a court views the evidence in the light most favorable to the prevailing party and will not set aside the jury's verdict if there is a reasonable basis in the record which supports that verdict.

Engineering Resources, Inc. v. CRS Steam, Inc., 1997 U.S. Dist. LEXIS 6101, *12 (N.D. Ill. 1997), aff'd mem., 1998 U.S. App. LEXIS 8486 (7th Cir. 1998).

> The Seventh Circuit has explained that a new trial may be granted "'only when the jury's verdict is against the clear weight of the evidence.'" *Calusinski v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994) (citation omitted). This standard requires the

courts "to accord the jury's verdict great deference ... [a] jury's verdict will not
be overturned if it has a reasonable basis in the record." Id. (citations omitted).

Mangren R&D Corp. v. National Chemical Co., 1995 U.S. Dist. LEXIS 871, *23 (N.D. Ill.

1995), aff'd, 87 F.3d 937, 941 (7th Cir. 1996). Clearly, a reasonable basis exists for the jury's

verdict. Hence, a new trial is not warranted.

## VII.  CONCLUSION

This is simply not a case where either a motion JMOL or a new trial is justified. Glenayre

presented its case using the strategies and evidence it felt appropriate -- which consisted almost

exclusively of contrasting the credibility of opposing witnesses, a classic jury question. That the

tactic proved unsuccessful does not justify either JMOL or a new trial. Glenayre's post-trial

motions should be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

Raymond P. Niro
Robert P. Greenspoon
William W. Flachsbart
NIRO, SCAVONE, HALLER & NIRO
181 West Madison Street, Suite 4600
Chicago, Illinois  60602
(312) 236-0733

Attorneys for Philip Jackson and PMJ Family
Limited Partnership

</div>

48

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **PHIL JACKSON'S**

**OPPOSITION TO GLENAYRE'S RENEWED MOTION JMOL OR FOR A NEW TRIAL**

was served upon the below-listed counsel by:

|  |  |
|---|---|
| Federal Express: | Philip P. Mann |
|  | Gregory F. Wesner |
|  | Thomas M. Donahue, Jr. |
|  | Christensen O'Connor Johnson Kindness |
|  | 1420 Fifth Avenue, Suite 2800 |
|  | Seattle, WA 98101 |
|  | (206) 682-8100 |
|  |  |
| Hand Delivery: | Jeffrey Cole |
|  | Andrew Staes |
|  | Cole & Staes, Ltd. |
|  | 321 S. Plymouth Court, Suite 1150 |
|  | Chicago, IL 60604 |
|  | (312) 697-0200 |
|  | *Attorneys for Glenayre Electronics, Inc.* |

on this _30_ day of April, 2003.

# SEE CASE FILE FOR EXHIBITS