Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 0256 | **DATE** | 7/8/2003 |
| **CASE TITLE** | Glenayre Electronics Inc. vs. Philip Jackson | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Glenayre's Renewed Motion for Judgment as a Matter of Law or, in the alternative, for a New Trial is GRANTED IN PART AND DENIED IN PART, Jackson's Motion to Amend the Judgment to Add Prejudgment Interest is GRANTED, and Glenayre's Motion for Stay Pending Resolution of Post-Trial Motions is DENIED AS MOOT. If Jackson does not consent to a remittitur of the jury's damages award to $2,650,000 by filing an appropriate document to that effect within twenty-one (21) days of the date of this Memorandum Opinion and Order, the Court orders that a new trial limited to the issue of damages be granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUL - 9 2003 | |
| ✓ | Docketing to mail notices. | date docketed | **169** |
| | Mail AO 450 form. | 15 | |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| WAP | courtroom deputy's initials | date mailed notice | |

U.S. DISTRICT COURT
CLERK
03 JUL -9 AM 7:54

Date/time received in central Clerk's Office          mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

JUL · 8 2003

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

GLENAYRE ELECTRONICS, INC.,

          Plaintiff,

    v.

PHILIP JACKSON, an individual,

          Defendant.

Case No. 02 C 0256

Hon. Harry D. Leinenweber

PHILIP JACKSON,

          Counterclaim-Plaintiff,

    v.

GLENAYRE ELECTRONICS, INC.,
METROCALL, INC., ARCH WIRELESS,
INC., PRIMECO PERSONAL
COMMUNICATIONS, L.P., and JOHN
DOES (1-10),

          Counterclaim-Defendants.

DOCKETED

JUL - 9 2003

## MEMORANDUM OPINION AND ORDER

On April 1, 2003, the jury in this case returned a verdict against Plaintiff Glenayre Electronics, Inc. ("Glenayre") finding infringement of Claims 5 and 79 of defendant Philip Jackson's ("Jackson") U.S. Patent No. 4,596,900 (the "'900 Patent"). The jury awarded Jackson $12,000,000 in damages. Presently before the Court is: (i) Glenayre's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial ("Motion JMOL"); (ii) Jackson's Motion to Amend the Judgment to Add Prejudgment Interest ("Interest Motion"); and (iii) Glenayre's Motion for Stay Pending Resolution of


169

Post-Trial Motions ("Stay Motion"). For the following reasons, the Motion JMOL is granted in part and denied in part, the Interest Motion is granted and the Stay Motion is denied as moot.

## LEGAL STANDARDS

### *Rules 50 and 59*

Glenayre brings its renewed Motion JMOL pursuant to Federal Rules of Civil Procedure 50(b) and 59. In it, Glenayre asks the Court to review whether there was sufficient evidence underlying the jury's finding that certain elements in Claims 5 and 79 are present in the MVP; Glenayre also moves for a remittitur of the jury's damages award.

Rules 50(b) and 59 differ both in the scope of allowable relief and the applicable standards of review. Rule 50(b) would permit the Court to enter judgment as a matter of law or, alternatively, to order a new trial. Rule 59, on the other hand, would only allow the Court to order a new trial. Under Rule 50, a court may enter judgment as a matter of law on a claim if "there is no legally sufficient evidentiary basis for a reasonable jury to find for th[e non-moving] party on [an] issue" necessary to the maintenance to that claim. FED.R.CIV.P. 50(a)(1). In carrying out a Rule 50 inquiry, the Court must determine "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed. . . . In other words, [the Court is] limited to assessing whether no rational

- 2 -

jury could have found for the [non-movant]." *Mathur v. Bd. of Trustees of So. Ill. Univ.*, 207 F.3d 938, 941 (7th Cir. 2000). Under Rule 59, however, a "district court may properly grant a new trial if the verdict is contrary to the clear weight of the evidence." *Smith v. Great Am. Restaurants, Inc.*, 969 F.2d 430, 434 (7th Cir. 1992); *see also* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2806 at 75 (2d Ed. 1995) [hereinafter "Wright, Miller & Kane"] (Under Rule 59, "[i]f, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.").

All of the issues raised in Glenayre's Motion JMOL will be reviewed under the standards of Rule 59. *Cf. Midland Mgmt. Corp. v. Computer Consoles Inc.*, 87 C 0791, 1993 WL 316725, at *1 (N.D. Ill. Aug. 17, 1993)(Posner, J.)("[A] motion for a new trial may be made even if no motions for judgment as a matter of law have been submitted."). However, to the extent that Glenayre seeks review under Rule 50(b), it will only be permitted insofar as Glenayre previously "mo[ved] for judgment as a matter of law at the close of all the evidence" under Rule 50(a) and only on the grounds identified in that pre-verdict motion. FED.R.CIV.P. 50(a)-(b); Advisory Committee Notes to the 1991 Amendments to Rule 50 ("[T]he post-verdict motion is a renewal of an earlier motion made at the close of the evidence. . . . A post-trial motion for judgment can be granted

- 3 -

only on grounds advanced in the pre-verdict motion."); *see also Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1107 (Fed. Cir. 2003)("In view of a litigant's Seventh Amendment rights, it would be constitutionally impermissible for the district court to re-examine the jury's verdict and to enter JMOL on grounds not raised in the pre-verdict JMOL."); *Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 775, 777 (7th Cir. 2002); *Mid-America Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1364 (7th Cir. 1996)("This Court gives effect to the plain language of Rule 50(b) by requiring that a motion for judgment as a matter of law be made at the close of all evidence in order to be preserved for post-trial consideration."); *United States E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1286 (7th Cir. 1995); *Hudak v. Jepsen*, 982 F.2d 249, 250 (7th Cir. 1992)("It is well established in this Circuit that the sufficiency of the evidence supporting jury submission of a case or the jury's findings is not reviewable on appeal unless the party seeking review has made a timely motion for a directed verdict in the trial court."). These procedural requirements under Rule 50(b) serve the salutary purpose of allowing the opposing party "an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment." Advisory Committee Notes to the 1991 Amendments to Rule 50.

Glenayre's Rule 50(a) motion at the close of all the evidence was directed solely to whether Jackson had adduced sufficient

evidence that, as required by Claims 5 and 79 of the '900 Patent, the MVP has a gate means "coupled" with a detecting means which functions "normally to prevent the detecting means from producing a sequence detection signal corresponding to a received sequence of predetermined tone signals" (Nov. 21, 2002 Claims Construction Order ("CC Order")). (Tr. at 615-23.) Accordingly, only that particular issue will receive the benefit of review under the standards of Rule 50(b).

### Infringement

The claims at issue in this case are "means-plus-function" claims. They are therefore governed by 35 U.S.C. § 112, ¶ 6, which provides as follows:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.

This case was submitted to the jury solely on the theory that the MVP literally infringed the '900 Patent. "Literal infringement of a § 112, ¶ 6 limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification. Functional identity and either structural identity or equivalence are *both* necessary." *Odetics, Inc. v.*

- 5 -

*Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999)(citations omitted; emphasis in original). Structural equivalence for purposes of Section 112, Paragraph 6 turns on "whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial." *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1043 (Fed. Cir. 1993).

## DISCUSSION

### *Gate Means Coupled to Detecting Means*

Glenayre contends that insufficient evidence underlies the jury's finding that the MVP has a gate means "coupled" with a detecting means which functions "normally to prevent the detecting means from producing a sequence detection signal corresponding to a received sequence of predetermined tone signals." Glenayre claims in particular that "Dr. Silva's testimony, at best, establishes only that a 'control signal' in the MVP is not produced until a password is entered," but does not "establish[] that this is achieved by inhibiting the precursor 'sequence detection signal' as actually required by Claims 5 and 79." (Motion JMOL at 17.) Glenayre further notes that Dr. Silva placed the purported detecting means and the purported gate means in the MVP in physically different areas of the MVP (namely, in the "T1 interface card and time space controller" (detecting means) and the "central controller" (gate means)), a fact Glenayre takes to demonstrate an absence of "coupling."

The Court rejects Glenayre's arguments. Dr. Silva gave expert testimony that the MVP contained both a detecting means (Tr. at

- 6 -

p. 340, l. 23 - p. 341, l.7) and a gate means (Tr. at p. 355, ll 14-
21) and offered his conclusion that Claims 5 and 79 of the '900
Patent read on the MVP. That his testimony may have placed these
means in "totally separate parts of the MVP" (Motion JMOL at 18) is
beside the point. The question, as Glenayre conceded when initially
making its Rule 50(a) motion for judgment as a matter of law, is
whether there is "some kind of operative association." (Tr. at 618.)
"Coupling" naturally denotes that these means must "be interacting
with each other. They have to be sending something back and forth."
(*Id.*) The evidence at trial would have allowed a rational jury to
conclude just that. In addition to Dr. Silva's testimony, the jury
had before it the MVP itself and heard a detailed explanation of its
function from Mr. Bettis. (Tr. at 544-68.) For example, Mr. Bettis
showed the jury the interconnected shelves of the MVP, and explained
that "the time space controller really interfaces the control shelf
back to all these other shelves to allow them to talk" (Tr. at 546)
and that "the [time space controller] and the central controller,
it's always communicating through this one buffer" (Tr. at 550). He
also testified that the time space controller will not shift into
"command" mode (in which the MVP detects and carries out touch-tone
commands) until *after* a valid password is entered. (Tr. at 550-54,
566-67, 569.) From this a rational jury *could* have concluded that
the MVP contains gate means "coupled" to detecting means that carry
out a function identical to the one articulated in Claims 5 and 79.

In addition, under Rule 59, this finding was not against the clear weight of the evidence.

Accordingly, Glenayre's motion for judgment as a matter of law or a new trial on the issue whether the MVP has a gate means "coupled" with a detecting means which functions "normally to prevent the detecting means from producing a sequence detection signal corresponding to a received sequence of predetermined tone signals" is denied.

### Control Means

Claims 5 and 79 identify a "control means" that "respond[s] to the sequence detection signal produced by the detecting means by producing a corresponding control signal." (CC Order.) Glenayre seizes on the word "corresponding" in this functional description and argues that "this means that each control sequence of Touch-Tones [such as "*,1"] entered into Jackson's device results in the production of a *unique* 'control signal.'" (Motion JMOL at 13 (emphasis supplied).) Put more precisely, Glenayre argues that Claims 5 and 79 require that the control input of an infringing device lead to the "production of one, and only one, 'corresponding control signal.'" (*Id.*)

Based on this interpretation, Glenayre contends that the jury's verdict is contrary to the clear weight of the evidence because it is "undisputed" that, in the MVP, entry of the same control sequence (such as "1") "can have profoundly different 'control effects' depending on what menu and table are in use at any time."

(Motion JMOL at 15 ("So, sometimes pressing 1 may mean, 'Go to the Sales Department,' whereas another time pressing a 1 might mean, 'I want to change my password,' or a 1 might mean, 'I want to leave a voicemail message,' or something like that. It depends on what menu you're in right now.")(quoting testimony of Alan Samuels, Tr. at 585).) This is essentially the same argument Glenayre offered in its Motion for Summary Judgment on Claims 1, 3, 59 and 69. In the context of that motion, however, Glenayre's argument was compelling, as those particular claims contain specific elements that forbid the production of different control signals in response to a given control sequence (i.e., the "gating means" of Claims 1 and 59 and the "flip-flop means" of Claims 3 and 69). But Claims 5 and 79 do not include a like limitation; no element of those claims would necessarily preclude a result wherein successive entry of the same control sequence stimulated a change in the state of the controlled device. Accordingly, Glenayre's motion for a new trial on this issue is denied.

### Access Limiting Circuit Means

Glenayre also requests a new trial on the question whether the MVP's string-compare password validation technique is insubstantially different than the '900 patent's one-digit-at-a-time password validation technique. Dr. Silva testified at length about this issue during trial, and concluded that the modus operandi of, and result achieved by, the password verification system in the MVP is identical to, or only insubstantially different from, the access limiting

- 9 -

circuit means of the '900 patent. (*See, e.g.*, Tr. at 316-17, 344-45, 352-53.) The jury was certainly entitled to credit Dr. Silva's conclusions. Given all the evidence before the jury on this issue, the Court cannot conclude that the jury's verdict was against the clear weight of the evidence. Accordingly, Glenayre's motion for a new trial on this issue is denied.

### Counter Means

Glenayre next argues that the jury's finding that the MVP has a "counter means" coupled to the gate means, and that the counter means functions to enable operation of the detecting means, is against the clear weight of the evidence. The Court disagrees. In its CC Order, the Court held that the "function of the counter means is to count the number of tone signals that are entered until the number of signals entered equals the number of digits in the access code. If the correct tone signals were entered, the counter means enables operation of the detecting means." At trial, Dr. Silva identified the "source code or portions of the source code that are responsible for the counting function" in the MVP. (Tr. at 349.) He described in some detail how that source code operates (Tr. at 351, 449-50) and then opined as follows:

> Q:  And does the Glenayre MVP have a counter means?
> A:  Yes, sir.
>
> Q:  What is that counter means?
> A:  Well, that's the electronic circuits that were empowered by that code we were discussing just a few minutes ago.

(Tr. at 355.)

- 10 -

Moreover, the jury's finding that the structure of the counter means in the MVP is "coupled" to the gate means is not against the clear weight of the evidence. The jury not only heard Dr. Silva's explanation of the purported counter means in the MVP, but also, as noted previously, heard Mr. Bettis explicate the various interconnections and operative linkages between the MVP's digital signal processor, its time space controller, and its central controller. (Tr. at 545-55; *cf. also id.* at p. 355, l. 22 - p. 356, l. 22.) In addition, both the counter means source code and the gate means source code were before the jury in a single source code document (Def.'s Ex. 102). Based on the totality of evidence before the jury, the Court cannot conclude that the jury's finding that the MVP's counter means is "coupled" (either identically or in an insubstantially different way) with the gate means was against the clear weight of the evidence. *Cf.* Wright, Miller & Kane, § 2806 at 74 ("[A] decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter.").

### *Remittitur*

Glenayre also moves the Court for a remittitur of the jury's $12,000,000 damages award. This motion is properly considered under Rule 59, *see* Wright, Miller & Kane, § 2807 at 78, and is well-taken.

The Court may not disturb the jury's damages award unless it was "grossly excessive or monstrous, clearly not supported by evidence,

- 11 -

or based only on speculation or guesswork." *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031 (Fed. Cir. 1996)(internal quotation marks omitted); *see also Am. Nat'l Bank & Trust Co. of Chicago v. Regional Transp. Auth.*, 125 F.3d 420, 437 (7th Cir. 1997)(remittitur only appropriate where jury award is "monstrously excessive, born of passion and prejudice, or not rationally connected to the evidence."). If the Court determines that the damages award was excessive, the proper course is either to order a new trial limited to the issue of damages, or to deny the motion for a new trial on the condition that the prevailing party file a remittitur in a stated amount. *See* Wright, Miller & Kane, § 2815 at 159-60, 169. In light of the Seventh Amendment, a court may only reduce a damages award "to the highest amount that the jury could properly have awarded." *See id.* at 167; *Unisplay, S.A. v. Am. Electronic Sign Co., Inc.*, 69 F.3d 512, 519 (Fed. Cir. 1995); *see also Dimick v. Schiedt*, 293 U.S. 474, 486 (1935)("Where the verdict is excessive, the practice of substituting a remission of the excess for a new trial is not without plausible support in the view that what remains is included in the verdict along with the unlawful excess - in that sense that it has been found by the jury - and that the remittitur has the effect of merely lopping off an excrescence.").

By statute, a patentee whose patent has been infringed is entitled to damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed

- 12 -

by the court." 35 U.S.C. § 284. "The royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant." *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995)(en banc). There was no "established" royalty rate in this case. *Cf. Nickson Indus., Inc. v. Rol Mfg. Co., Ltd.*, 847 F.2d 795, 798 (Fed. Cir. 1988); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983)(for a royalty to be "established" it "must be paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention"). Thus, the reasonable royalty calculation must be based on a hypothetical negotiation, an exercise in abstraction which "requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began." *Rite-Hite Corp.*, 56 F.3d at 1554.

Here, the infringement began no earlier than 1988 (the rollout date for the MVP). It is crucial to remember, however, that although the earliest date of infringement sets the timeframe for the hypothetical negotiation, Jackson may only recover damages for the period stretching from the date when Jackson first affirmatively *notified* Glenayre of its infringement through the date of expiration of the '900 Patent. 35 U.S.C. § 287. In this case, that damages period extends only from December 19, 2001 through June 24, 2003.

Although performing this hypothetical analysis under 35 U.S.C. § 284 will necessarily involve some measure of extrapolation and prediction, it nonetheless must rest on "sound economic and factual predicates." *Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302, *1311 -1311 (Fed. Cir. 2002). That said, a wide range of factors can be relevant to such a hypothetical negotiation, *see Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003); *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 898 (Fed. Cir. 1986); *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970), and in fact the Court's instructions to the jury identified 12 separate factors that could be considered (Tr. at 741-42).

Although there was no evidence of a firmly "established" royalty rate, Jackson did introduce six license agreements involving the '900 Patent negotiated in arms-length transactions with third parties containing representative royalty terms ("Jackson Licenses"). These prior license agreements "should carry considerable weight in calculating a reasonable royalty rate." *Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995); *see also Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302, 1313 (Fed. Cir. 2002) (plaintiff's damages expert improperly "ignored [plaintiff's] established licensing practice"); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1568 (Fed. Cir. 1988) ("[T]he patentee's usual licensing approach should be considered in assessing a reasonable royalty."). In addition, Glenayre itself introduced two

- 14 -

license agreements reflecting royalty rates it paid for rights to use other patents covering an integrated voicemail system ("Glenayre Licenses"). Of all the evidence presented in this case, the Jackson Licenses and the Glenayre Licenses together constitute the most cogent, probative basis for determining the amount of a reasonable royalty.

The Jackson Licenses reflect lump-sum amounts that, according to Jackson, were based upon the following royalty rates calculated as a percentage of sales: Cobra Electronics (2.5%); Sanyo Electronics (2.8%); Unical-Northwestern Bell (5%); Swatch (2.5%); Samsung Electronics ($380,000 lump-sum payment - no percentage indicated); Brother Industries (3%). It bears emphasis that each of the Jackson Licenses were granted for terms greater than the 18-month damages period in this case, and broadly granted the right to use every aspect of the '900 Patent. The Glenayre Licenses, on the other hand, conferred an unrestricted right to use patents covering a complete, complex voicemail system and required a royalty payment of 6% of sales plus either a $250,000 cash payment or 30,000 shares of Glenayre common stock.

The unbounded rights to use every aspect of the patents that are the subject of the Glenayre Licenses and the Jackson Licenses distinguishes them from the more limited license that would result from a hypothetical negotiation in this case. That is, because only Claims 5 and 79 of the '900 Patent were in issue at trial, the jury's liability verdict rested entirely on a narrow finding that the MVP

- 15 -

infringed the particular password verification system disclosed in those specific claims. This means that a hypothetical negotiation between the parties in this case would have been directed only to a license for that specific portion of the '900 Patent, unlike the Jackson Licenses and Glenayre Licenses which are unrestricted in the scope of the usage rights granted.

Record evidence developed during trial showed that Glenayre's actual sales of MVP products throughout the damages period up until January 1, 2003 totaled $27,000,000. (Tr. at 270-71.) Assuming a best-case sales scenario for Glenayre through the end of the damages period based on available sales numbers from 2002, it is uncontested that overall sales of MVP products during the damages period would equal approximately $40,000,000. Based on that benchmark sales total, the jury's $12,000,000 damages award reflects a whopping royalty rate of 30%, a rate five times greater than the very highest rate disclosed in any license agreement offered into evidence.

There is absolutely no support in the record for such an extravagantly high royalty percentage. Couched in the language of the governing legal standard, the jury's damages award was "grossly excessive," "clearly not supported by evidence," and smacks of "speculation or guesswork" or an otherwise impermissible intent to punish Glenayre. *Oiness*, 88 F.3d at 1031; *see also Modine Mfg. Co. v. Allen Group, Inc.*, No. C-85-6946-DLJ, 1989 WL 205782 (N.D. Cal. Nov. 30, 1989), *aff'd* 917 F.2d 538 (Fed. Cir. 1990). Indeed, given the range of royalties previously accepted by Jackson in the Jackson

Licenses, the range of royalties previously paid out by Glenayre under the Glenayre Licenses, the limited duration and scope of the necessary license in this case (restricted, as it is, to the particular password verification system disclosed in Claims 5 and 79 and an 18-month damages period), and the absence of any expert testimony on the subject of damages, *cf. Hanson*, 718 F.2d at 1078-79, the highest possible royalty rate the jury could have properly awarded, consistent with the relevant evidence before them, was 6% of MVP sales during the damages period plus a $250,000 lump-sum payment, or $2,650,000. *Cf. Unisplay, S.A. v. Am. Electronic Sign Co., Inc.*, 69 F.3d 512, 519 (Fed. Cir. 1995)(A jury's damages award "must be within the range encompassed by the record as a whole."); *Trell v. Marlee Electronics Corp.*, 912 F.2d 1443, 1446 (Fed. Cir. 1990) ("Although there is room for exercise of a common-sense estimation of what the evidence shows would be a 'reasonable' award,' the district court must consider what is reasonable 'under all the circumstances.'" (internal quotation marks omitted)).

Accordingly, the Court denies Glenayre's motion for a new trial on damages on the condition that Jackson consent to a remittitur of the jury's damages award to $2,650,000. If Jackson refuses, the Court orders a new trial on damages.

### Prejudgment Interest

Should Jackson accept the remittitur, there is then the matter of prejudgment interest. Glenayre and Jackson agree that prejudgment interest is appropriate, 35 U.S.C. § 284, but wrangle over both the

applicable interest rate and whether the damages amount was awarded as a lump-sum or as a stream of royalty payments to be spread out over time.

Prime rate is appropriate in this case. *See Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) (Posnser, C.J.) ("For the future, we suggest that district judges use the prime rate for fixing prejudgment interest where there is no statutory interest rate."). In addition, there can be little doubt based on the record evidence (in particular, the Glenayre Licenses and the Jackson Licenses) that the jury awarded – and that Glenayre believed the jury to have awarded (*see, e.g.,* Motion JMOL at 1, 7-8) – a lump-sum damages amount. Accordingly, assuming Jackson accepts the remittitur and obviates the need for a new trial on damages, the Court concludes that interest should be awarded on the reduced $2,650,000 damages amount at the prime rate charged monthly by banks on short-term business loans, with interest compounded monthly from December 19, 2001 through April 1, 2003, the date of judgment. *Cf. Mendenhall v. Barber-Greene Co.*, 80 C 6747, 1990 WL 156519, at *3 (N.D. Ill. Oct. 5, 1990).

## CONCLUSION

For the foregoing reasons, Glenayre's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial is **GRANTED IN PART AND DENIED IN PART,** Jackson's Motion to Amend the Judgment to Add Prejudgment Interest is **GRANTED,** and Glenayre's

Motion for Stay Pending Resolution of Post-Trial Motions is **DENIED AS MOOT**. If Jackson does not consent to a remittitur of the jury's damages award to $2,650,000 by filing an appropriate document to that effect within twenty-one (21) days of the date of this Memorandum Opinion and Order, the Court orders that a new trial limited to the issue of damages be granted.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Date: July 8, 2003